DOCTOR JOHN'S, INC., an Iowa
Corporation, Plaintiff,

v.

CITY OF SIOUX CITY, Iowa, and
Paul Eckert, in his official capacity as City Manager, Defendants.

No. C 03–4121–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Feb. 26, 2004.

Brian Blane Vakulskas, Vakulskas &
Hoffmeyer, Sioux City, IA, W Andrew

McCullough, McCullough & Associates, L.L.C., Midvale, UT, for Plaintiff.

Connie E. Anstey, James L. Abshier, City Attorney's Office, Sioux City, IA, for Defendant.

MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION and PRELIMINARY INJUNCTION

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION AND BACKGROUND* ................................1025
 A. *Procedural Background*..............................................1025
 B. *Factual Background*.................................................1025
 1. *Doctor John's stores* ........................................1026
 2. *The appearance and intended location of the Sioux City store* ........1027
 3. *Sioux City zoning ordinances and amendments* ......................1028
 a. *Ordinances defining "adult entertainment businesses" prior to October 2003* .........................................1028
 b. *Ordinance amendments redefining "adult entertainment businesses"* .........................................1029

II. *LEGAL ANALYSIS* ....................................................1033
 A. *Standards For A Preliminary Injunction* ..............................1033
 B. *Consideration Of The Dataphase Factors* .............................1034
 1. *Likelihood of success on the merits* ...............................1034
 a. *The nature of the requirement* ...............................1034
 b. *Applicable law*..............................................1034
 c. *Preliminary application of the law* ...........................1035
 i. *"Ban" or "time, place, and manner" regulation?* ............1035
 ii. *"Content neutral" or "content based"?* ....................1035
 iii. *Do the ordinances withstand the appropriate level of scrutiny?* .........................................1037
 2. *Irreparable harm* ...............................................1039
 3. *Balance of harms* ...............................................1040
 4. *The public interest*.............................................1041
 C. *Scope Of Injunctive Relief* .........................................1042
 D. *The Bond Requirement* .............................................1043

III. *CONCLUSION* ......................................................1044

"Experience should teach us to be most on our guard to protect liberty when the Government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding."

—Justice Brandeis, dissenting in *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928)

Unquestionably, a city council has the authority to enact zoning ordinances to regulate the location of adult entertainment businesses in the community. The court is now presented with what is undoubtedly a well-meaning attempt by a city council to do just that. However, in its zeal to protect certain perceived cultural values by amending existing ordinances to keep a particular putative adult entertainment business from opening at its chosen location, the city council may have misunderstood, or overlooked, what is required for a zoning ordinance addressing adult entertainment businesses to satisfy the First Amendment's guarantee of free

speech. Therefore, the court is presented with the targeted business's motion for a preliminary injunction to enjoin, as unconstitutional, enforcement of the city council's newly amended zoning ordinances relating to adult entertainment businesses.

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

Plaintiff Doctor John's, Inc. (Doctor John's), a putative "adult entertainment business," filed its complaint in this action on December 9, 2003, against the City of Sioux City, Iowa (the City), and Paul Eckert, in his official capacity as Sioux City's City Manager, challenging Sioux City's municipal ordinances concerning adult entertainment businesses enacted in October and November 2003. On January 20, 2004, Doctor John's filed an Amended Complaint, and on February 10, 2004, filed a Second Amended Complaint challenging further amendments to Sioux City's zoning ordinances concerning adult entertainment businesses, enacted in January 2004. In its Second Amended Complaint, Doctor John's alleges that these ordinances result in violations of the right to free expression protected by the First Amendment to the United States Constitution and constitute prior restraints on free expression; fail to allow reasonable alternative means of expression; result in a taking of its business property without due process of law; result in infringement of First Amendment freedoms in a manner greater than necessary to further any valid interests of the City; lack adequate procedural safeguards and fail to provide for prompt judicial re-

view; and result in a denial of equal protection.

On January 5, 2004, Doctor John's filed a Motion For Preliminary Injunction in which it requested that the court enjoin the City from enforcing a temporary moratorium on adult entertainment businesses enacted in October 2003. However, that moratorium has since expired. At an evidentiary hearing on February 20, 2004, on the motion for a preliminary injunction and other matters,[1] the court allowed Doctor John's to amend orally its Motion For Preliminary Injunction to seek an injunction against enforcement of the new "adult entertainment business" ordinances enacted in January 2004.

At the preliminary injunction hearing, Doctor John's was represented by W. Andrew McCullough of McCullough and Associates, L.L.C., in Midvale, Utah, and Brian B. Vakulskas of Vakulskas Law Firm, P.C., in Sioux City, Iowa. The City of Sioux City and Paul Eckert were represented by Assistant Sioux City Attorney Connie E. Anstey, who presented the City's evidence and arguments, and Sioux City Attorney James L. Abshier. Doctor John's Motion For Preliminary Injunction is fully submitted. In light of the urgency of the matter to the parties, the court has moved with speed, but not with haste, to provide as prompt a ruling on the present motion as due consideration of the merits would permit.

### B. Factual Background

The evidence presented at the preliminary injunction hearing[2] and supporting submissions of the parties, including exhibits attached to pleadings and the appendices of the parties submitted in support of

---

1. At the hearing on February 20, 2004, the court also heard oral arguments on the City's Motion for Summary Judgment and Motion to Quash Service. However, the court will dispose of those motions by separate order.

2. Quotations of testimony at the preliminary injunction hearing are taken from an unedited "real time" transcript.

or resistance to a motion for summary judgment, also pending before the court, provide the following factual background:

### 1. Doctor John's stores

Doctor John's currently operates approximately ten stores in four states that sell a variety of merchandise, including primarily lingerie, swim wear, women's shoes, lotions, and oils. However, the stores also sell games, novelty items, and "marital aids" or "adult toys," including, for example, vibrators, "dildos" and "masturbation toys," and blow up dolls (some described as "anatomically correct"). Thus, Doctor John's maintains that its stores sell a variety of products designed to appeal to couples who wish to enhance their love lives. Although Doctor John's contends that its stores are not primarily video stores, the stores also sell videotapes, DVDs, magazines, and books, which Doctor John's concedes depict or describe nude or partially clothed persons and/or sexual activity.

Doctor John's represents that it has leased property located at 3507 Singing Hills Boulevard, Sioux City, Iowa, for one of its stores, which would be its first such store in Iowa. Doctor John's intends to sell the items described above in the Sioux City store and, indeed, has stocked or started to stock that store with such items. Doctor John's only witness at the preliminary injunction hearing, Bonnie Bolton, who testified that she "run[s] the stores," testified that, as of February 20, 2004, the store in Sioux City could be ready to open in approximately two days, because only some cleaning was required before the store would be ready to open. The store has approximately 6,000 square feet of retail space and Ms. Bolton testified that 75 to 80 percent of the store would be devoted to lingerie and swim wear, somewhere around 20 percent to lotions, oils, etc., and

5 percent or less of the floor space, at the back of the store, would be devoted to videos. Although there were some suggestions in the record that, in addition to "adult" videos, Doctor John's stores sell videos that are devoted to non-sexual topics and activities, such as instructional videos on massage, Ms. Bolton testified that all or nearly all of the videos at the Sioux City store would be "adult videos." When asked to clarify her testimony on this point, Ms. Bolton testified that less than 25 percent of videos would be "massage videos." Although Ms. Bolton did not testify to an estimated percentage of total stock-in-trade that would be devoted to "novelties" or "adult toys," and explained that she could not say what percentage of "novelties" would be considered "adult," she did testify that 75 to 80 percent of the store's total stock would be "non-adult products." Ms. Bolton also testified that Doctor John's would be willing to adhere to any limitation imposed by the court or the city on the percentage of "adult" items that could be sold in the store at its present location.

Ms. Bolton testified that, although Doctor John's stores cater to couples, they are "gear[ed] more towards women, because we want women to feel comfortable coming into our stores." Minors are not admitted to Doctor John's stores, because Doctor John's "d[oesn't] believe that children should be in a store that carries adult material," notwithstanding Ms. Bolton's testimony that about 80 percent of the merchandise in the stores is "non-adult products." Ms. Bolton testified that Doctor John's checks for proof of age and identity of everyone who comes into its stores to enforce its self-imposed ban on minors.

Ms. Bolton testified that it was her understanding that none of Doctor John's stores was located in an "adults only" zone

and that none of the stores, and none of the stores' employees, in any of the existing locations, was required to have a sexually-oriented business license. Ms. Bolton testified that it was her understanding that another representative of Doctor John's had been convicted of selling obscene materials to a minor in Utah, although she opined that he had been "set up" by the police, and that the same representative had been charged with similar offenses involving selling obscene material to adults in Omaha, Nebraska, and Scotts Bluff, Nebraska.

*2. The appearance and intended location of the Sioux City store*

Several photographs of the Doctor John's store at its intended location at 3507 Singing Hills Boulevard, Sioux City, Iowa, were shown to the court for "illustrative" purposes during the preliminary injunction hearing. The photographs reveal a handsome freestanding building with an interior display of swimsuits and lingerie that dominates the first impression of the store. This merchandise is presented very much in the same manner as most national brand name clothing stores, which have become ubiquitous at malls across urban and suburban America.

Thus, the first impression of the store is a far cry from the first image that most people would likely have of an "adult book store" or "sex shop." There is nothing seedy about the neighborhood, store building, or store front. In fact, from a quick drive-by, one would likely assume that the business was a rather upscale retail store. There are no "adult" signs or banners proclaiming "peep shows," "live entertainment booths," "XXX movies," "live models," "adult massage," or other tasteless come-ons all too familiar from adult entertainment stores that exist in virtually every American city of any size.[3]

The location where Doctor John's is preparing to open its store is in a commercial area across from a Wal-Mart, adjacent to a strip mall, a chiropractor's office, and a nail salon, and near various restaurants and motels, a minor league baseball stadium, a park with little league or softball fields, a bowling alley, and an ice-skating rink. The location of the anticipated Doctor John's store is zoned as General Business–Commercial Planned Development ("BG–C") under the Sioux City Municipal Code. That is, it is in a General Business ("BG") zone, with a Commercial Planned Development Overlay ("-C").

---

**3.** This court has rather limited knowledge of adult entertainment establishments. However, for the entire nine plus years that the undersigned has been a U.S. District Court Judge in Sioux City, Iowa, there has been one such establishment directly across the street from the federal courthouse where the undersigned has his chambers. At the undersigned's request—and without the need for a lot of prompting—one of the undersigned's law clerks walked out of the courthouse to note the appearance of that adult book store's storefront today. The law clerk reports that the store is in a two-story gray building with a garish combination of a turquoise awning and purple trim. The awning announces in large letters that this is the "Adult Emporium" and "Adult Book & Video," which is "Open 24 Hours." The store's sign bears a stylized image of an apparently nude woman lounging behind the letters of the store's name. Although absent today, the law clerk recalls that, in the past, the store has occasionally been adorned with a banner spanning the entire front of the second story of the building announcing photograph signings with live models. Although this store's facade is considerably more understated than those of similar businesses that the court recalls seeing in his younger days in Times Square in New York, it is also considerably more overt about the "adult" nature of its merchandise than the facade of Doctor John's intended store in Sioux City. Doctor John's Sioux City store, at least as it prepares to open, displays on its facade only the store's name and the words "novelties" and "lingerie," neither of which necessarily connotes "adult" merchandise.

### 3. Sioux City zoning ordinances and amendments

More specifically, Sioux City Municipal Code 25.56.010 states the purpose of the General Business ("BG") Zone to be the following:

> The BG zone is intended to provide business locations for retail, service and wholesale uses serving a city-wide clientele. The zone is intended to be located in areas characterized by good accessibility, including those areas which are heavily exposed to automobile traffic.

SIOUX CITY MUNICIPAL CODE 25.56.010, Defendants' Summary Judgment Appendix at 3.[4] Principal uses permitted in a BG zone are designated in Sioux City Municipal Code 25.56.020. However, Sioux City Municipal Code 25.56.030 expressly prohibits certain uses in a BG zone, including, *inter alia*, the following:

> 5. Adult entertainment businesses, as defined in chapter 25.04 of this title. All nonconforming uses in the BG business zone may continue in operation under the provisions of Chapter 25.98 of the municipal code. All permits required herein shall be applied for within thirty days from the effective date of the ordinance codified in this chapter;
>
> 6. All uses not specifically enumerated as permitted uses in the BG zone are prohibited, subject to the right, set forth in Subchapter VII of Chapter 25.12, of an applicant to seek use interpretation by the director of building inspection.

SIOUX CITY MUNICIPAL CODE 25.56.030, Defendants' Summary Judgment Appendix at 4.

### a. Ordinances defining "adult entertainment businesses" prior to October 2003

Prior to October 27, 2003, "adult entertainment businesses"—which are banned from a general commercial zone, such as the zone where Doctor John's wishes to open its Sioux City store—were defined by the Sioux City Municipal Code as

> businesses which, as a part of or in the process of delivering goods and services, displays to its patrons specified sexual activities or specified anatomical areas in printed form or through any form of photographic medium or by use of male or female models. The following are examples of adult entertainment businesses but the list is not to be considered exclusive: adult book stores; adult motion picture theaters; adult video stores, model studios, introductory services, and escort service bureaus.

SIOUX CITY MUNICIPAL CODE 25.04.020(A–2), Defendants' Summary Judgment Appendix at 9. Prior to October 27, 2003, "adult book store" was defined as

> an establishment having as *a substantial portion* of its stock in trade any of the following: books, periodicals, or magazines for sale when said stock in trade is distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas.

SIOUX CITY MUNICIPAL CODE 25.04.020(A–2)(a), Defendants' Summary Judgment Appendix at 9 (emphasis added). Similarly,

---

**4.** The Commercial Planned Development Overlay Zone ("-C") does not generally change the permitted uses in a BG zone:

> The permitted uses, permitted accessory uses and the permitted conditional uses shall be the same as the zone upon which the -C zone is overlaid, except that this range of uses may be reduced by the terms of an approved planned development concept plan or an approved planned development site plan if no concept plan is required.

SIOUX CITY MUNICIPAL CODE 25.74.212, Defendants' Summary Judgment Appendix at 6.

prior to October 27, 2003, an "adult video store" was defined as

> an establishment which, having as *a substantial portion* of its video inventory for sale or rental for either on-premises or off-premises viewing, has films and/or videotapes having as a dominant theme material distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas. Such inventory must be offered in an area segregated by a gate or door and monitored and indicated as being off-limits to minors.

SIOUX CITY MUNICIPAL CODE 25.04.020(A–2)(c), Defendants' Summary Judgment Appendix at 9 (emphasis added). Under this ordinance, "substantial" was defined to mean "more than twenty-five percent of the book, periodical, magazine or video inventory are [sic] distinguished or characterized by an emphasis on matter depicting, describing or relating to specified sexual activities or specified anatomical areas." *Id.* at 25.04.02(A–2)(i). Thus, this ordinance defined "adult entertainment businesses" by application of a "25–percent rule," under which businesses with twenty-five percent or more of their media stock-in-trade in "adult" media were "adult entertainment businesses," and consequently, were banned from general commercial zones of Sioux City.

### b. *Ordinance amendments redefining "adult entertainment businesses"*

Prior to setting up its store in Sioux City, Doctor John's representatives had some contact with the City Attorney concerning zoning requirements for the intended location of the Doctor John's store in Sioux City in the course of which Doctor John's representatives indicated a willingness to adhere to the then-existing "25–percent rule." *See* Plaintiff's Complaint, Exhibit C (on-line copy of Sioux City Journal article dated November 11, 2003); Plaintiff's Complaint Exhibit B (Request For City Council Action for November 10, 2003, meeting).[5] However, before Doctor John's could complete preparations to open its store in Sioux City, Sioux City's zoning requirements for "adult entertainment businesses" underwent significant amendment.

Specifically, on October 27, 2003, the City Council for the City of Sioux City passed Ordinance 2003–000953, which imposed a moratorium on the opening of any "adult" businesses up to and including January 5, 2004. Defendants' Summary Judgment Appendix at 21. In a newspaper article published November 11, 2003, the City Attorney, James Abshier, was quoted as saying, "What prompted [the moratorium] was some discussion I had with Doctor John's representatives" in which those representatives "told me they would be happy to live with the 25 percent limitation instead of stocking their business with all adult items." Plaintiff's Complaint, Exhibit C. Similarly, a "Request For City Council Action" from Mr. Abshier, dated November 10, 2003, indicates that Doctor John's had represented that its store would comply with the "25–percent rule" imposed by the existing ordinances and suggested that a moratorium would be appropriate "[t]oo preserve the integrity of the review process." Plaintiff's Complaint, Exhibit B. The moratorium amendment itself indicates that it was based on the City Council's findings that it had been advised and believed that the existing ordinance was "incomplete and inadequate in

---

**5.** Although a copy of the newspaper article and the Request For City Council Action were attached to Doctor John's original Complaint, they were not specifically entered into evidence at the preliminary injunction hearing.

that it fails to regulate all aspects of the adult entertainment business," that the existing ordinance inadequately regulated the locations where adult entertainment businesses might locate, and that it was in the public interest to study zoning regulations to ensure their effectiveness, validity, and constitutionality. Defendants' Summary Judgment Appendix at 21. Ordinance 2003–000953 was amended on November 10, 2003, by Ordinance 2003–000985, but that amendment did not alter the "sunset" date of January 5, 2004, for the moratorium.

Senior Planner for the City of Sioux City, Brian Nelson, the only representative of the City of Sioux City to testify at the preliminary injunction hearing, testified that "when this first came up," he was "asked to review a number of studies . . . that were done by various cities throughout the country." Mr. Nelson testified that his reading of those studies indicated that opening a business that he believed was like the one that Doctor John's intended to open in Sioux City would have "adverse impacts" upon neighboring properties and "other negative secondary effects." Specifically, Mr. Nelson testified concerning his understanding of a study by the City of Kansas City from approximately 1986 indicating that a large percentage of neighboring property owners found "sex shops" objectionable, and a study from Rochester, New York, indicating that neighboring properties did not appreciate in value as fast as properties in areas not in close proximity to the area where adult entertainment uses were permitted. However, Mr. Nelson testified that he could not remember the precise definitions of the adult entertainment businesses or "sex shops" at issue in these studies. Mr. Nelson also testified that he received concerned telephone calls from proprietors of existing businesses near

where Doctor John's intended to locate its Sioux City store.

There is no evidence in the record, however, that Mr. Nelson conveyed his understanding or summaries of the studies he examined to members of the City Council of the City of Sioux City or to the City Attorney or conveyed the studies themselves to City Council members or to the City Attorney. Surprisingly, the studies themselves were never offered or admitted into evidence in the preliminary injunction proceedings. Although the parties do not appear to dispute that the subsequent amendments to the City of Sioux City's ordinances were drafted by the City Attorney, there is no evidence that the City Attorney or the City Council members independently reviewed any similar studies or other evidence of the "secondary effects" of adult entertainment businesses at any time prior to amending Sioux City's zoning ordinances. Mr. Nelson also testified that he did not draft the amended ordinances, nor was he privy to any discussions about the drafting of the amended ordinances, except to a "very limited" degree.

Despite the lack of evidence that the studies reviewed by Mr. Nelson were ever considered by any decision-makers, the City Council did undertake significant amendments to its zoning ordinances with regard to adult entertainment businesses at the end of the moratorium period. Unlike the moratorium amendment, the January 2004 amendments do not include by any statement of findings by the City Council or any explanation of the impetus or rationale for those amendments. Nevertheless, on January 5, 2004, the "sunset" date for the moratorium, the City Council adopted Ordinance 2004–0004, Section 1 of which provides, in pertinent part, as follows:

A–2 "Adult Entertainment Business" means businesses which as a part of or in the process of delivering goods and services displays to its patrons specified sexual activities, specified anatomical areas though the use of adult media or male or female models, or offers for sale sexually oriented toys or novelties. The following are examples of adult entertainment business [sic] but the list is not to be considered exclusive: adult media store, adult motion picture theater, adult internet store, a sex shop, a video-viewing booth, a lingerie modeling studio or model studio.

a. "Adult Internet Store" means a store that offers its patrons with or without charge a computer with internet access for the purpose of accessing internet sites or that permits patrons to access internet sites that are characterized as displaying hard-core material or specified sexual activities.

b. "Adult Media" means magazines, books, videotapes, movies, slides, cd-roms or other devices used to record computer images, or other media that are distinguished or characterized by their emphasis on matter depicting, describing, or relating to hard-core material.

c. "Adult Media Store" means an establishment that rents and /or sells media, and that meets any of the following three tests:

(1) 25 percent or more of the gross public floor area is devoted to adult media.

(2) 25 percent or more of the stock-in-trade consists of adult media.

(3) It advertises or holds itself out in any forum as "XXX,"adult," "sex," or otherwise as a sexually oriented business other than an adult media store, or adult motion picture theater.

d. "Adult Motion Picture Theater" means an establishment emphasizing or predominantly showing hard core material.

e. "Establishment" means any business regulated by this title.

f. "Gross Public Floor Area" means the total area of the building accessible or visible to the public, including showrooms, motion picture theaters, motion picture arcades, service areas, behind-counter areas, storage areas visible from such other areas, restrooms (whether or not labeled "public"), areas used for cabaret or similar shows (including stage areas), plus aisles, hallways, and entryways servicing such areas.

g. "Hard-core Material" means media characterized by sexual activity that includes one or more of the following: erect male organ; contact of the mouth of one person with the genitals of another; penetration with a finger or male organ into any orifice in another person; open female labia; penetration of a sex toy into an orifice; male ejaculation; or the aftermath of male ejaculation. Hard core material also means media characterized by the display of specified anatomical areas or specified sexual activities.

. . .

j. "Media" means anything printed or written, or any picture, drawing, photograph, motion picture, film, videotape or videotape production, or pictorial representation, or any electrical or electronic reproduction of anything that is or may be used as a means of communication. Media includes but shall not necessarily be limited to books, newspapers, magazines, movies, videos, sound recordings, cd-roms, other magnetic media, and undeveloped pictures.

. . .

m. "Sex Shop" means an establishment offering goods for sale or rent and that meets any of the followings tests:

(1) The establishment offers for sale items from any two of the following categories:

(i) adult media

(ii) lingerie, or

(iii) leather goods marketed or presented in a context to suggest their use for sadomasochistic practices; and the combination of such items constitutes more than 10 percent of its stock in trade or occupies more than 10 percent of its floor area.

(2) More than 5 percent of its stock in trade consists of sexually oriented toys or novelties.

(3) More than 5 percent of its gross public floor area is devoted to the display of sexually oriented toys or novelties.

n. "Sexually Oriented Toys or Novelties" means instruments, devices, or paraphernalia either designed as representations of human genital organs or female breasts, or deigned or marketed primarily for use to stimulate human genital organs.

SIOUX CITY MUNICIPAL ORDINANCE 2004–0004, Defendants' Summary Judgment Appendix at 30–31. Perhaps the most significant changes from the pertinent ordinances in force prior to October 2003 are the addition of the definition of "sex shop" in subsection (m) and the definition of "sexually oriented toys or novelties" in subsection (n), which have no correlates in earlier versions of the ordinance.

On January 12, 2004, the Sioux City Counsel adopted Ordinance 2004–0024, which amended a subsection of Ordinance 2004–0004 and formally repealed the prior moratorium on "adult entertainment businesses," which had expired on January 5, 2004. The amended ordinance provides as follows:

*Section 1:* Subsection 25.04.020(A–2)(c) of the Sioux City Municipal Code is amended to read as follows:

c. "Adult Media Store" means an establishment that rents and/or sells media, and that meets any of the following three tests:

(1) 25 percent or more of the gross public floor area is devoted to adult media.

(2) 25 percent or more of the *media* stock-in-trade consists of adult media.

(3) It advertises or holds itself out in any forum as "XXX," "adult," "sex," or otherwise as a sexually oriented business other than an adult media store, or adult motion picture theater.

SIOUX CITY MUNICIPAL ORDINANCE 2004–0024, Attachment "A" to Defendants' Supplemental Brief (emphasis added). Thus, ordinance 2004–0024 clarified the twenty-five percent limitation on adult media in the definition of an "adult media store" by inserting the word "media" before "stock-in-trade" in Section 1(c)(2), so that the definition would be triggered at 25 percent of the "*media* stock-in-trade," not 25 percent of *all* stock-in-trade.

Mr. Nelson initially testified that determinations of whether or not a particular business violates these ordinances would be based on "the general thrust of the store," and if that "general thrust" would be "adult entertainment," the City planners "would tend to take a very close look at that." When the definitions of "sex shops" and other "adult entertainment businesses" in the ordinances were pointed out to him, Mr. Nelson backtracked or, perhaps, clarified his testimony, explaining that zoning decisions would be based on the definitions in the ordinances, not some subjective test, although he opined that "usually things aren't as clear cut as they

would seem by simply looking at definitions." Mr. Nelson then testified that, in his opinion, Doctor John's intended store would be a "sex shop" within the meaning of the amended ordinances, because of a combination of selling "adult media" and "lingerie" and having more than five percent of its stock in sexually oriented toys and novelties.

Mr. Nelson admitted that he was unaware of any prior version of the pertinent ordinances that included "lingerie" in the definition of any adult entertainment business. Mr. Nelson testified that his office received a number of complaints when Victoria's Secret opened a store in the shopping mall in Sioux City four or five years ago, because lingerie was sold there, but his office "disregarded" those calls, because "for obvious reasons, we didn't think those applied." Although Mr. Nelson testified that he did not know why "lingerie" was added to the definitions in the amended ordinances, he conceded that Doctor John's is the only store in Sioux City that he knew of that would be barred from a BG zone by the inclusion of "lingerie" in the definition of an adult entertainment business.

Doctor John's has not sought rezoning of the intended location of its Sioux City store to permit an "adult entertainment business" as defined in these amended ordinances at that location. Nor does the record indicate that Doctor John's has sought to relocate its Sioux City store to an area where "adult entertainment businesses" are permitted, such as a General Business—Metropolitan (BG–M) zone, like the downtown area of Sioux City, where the City contends that there are a number of vacant locations. One of the questions in this lawsuit, of course, is whether there is any reason that Doctor John's should have to take such steps. However, the question before the court in the present

ruling is whether the City should be preliminarily enjoined from enforcing its amended ordinances against Doctor John's to prevent the opening of the Doctor John's store at 3507 Singing Hills Boulevard.

## II. LEGAL ANALYSIS

### A. Standards For A Preliminary Injunction

As this court explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders are generally measured against the standards set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (*en banc*). *See Branstad v. Glickman,* 118 F.Supp.2d 925, 937 (N.D.Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1411 (N.D.Iowa 1996). These factors include (1) the movant's probability of success on the merits, (2) the threat of irreparable harm to the movant absent the injunction, (3) the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Branstad,* 118 F.Supp.2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir. 2000)); Fed. R. Civ. P. 65(b)(1).

" 'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.' " *Entergy, Ark., Inc.,* 210 F.3d at 898 (quoting *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir.1998)). As the Eighth Circuit Court of Appeals has also explained,

These factors are not a rigid formula. However, "[t]he basis of injunctive relief

in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996). *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.1999); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994) ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

The court will, therefore, consider each of the *Dataphase* factors in turn, to determine whether Doctor John's has established that the balance of the *Dataphase* factors weighs in favor of issuance of a preliminary injunction in this case.

### B. Consideration Of The Dataphase Factors

### 1. Likelihood of success on the merits

### a. The nature of the requirement

In prior cases, this court has explained the meaning of "likelihood of success on the merits" in the context of a motion for a preliminary injunction as follows:

"[A]t the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998) (internal citations and quotation marks omitted). Thus, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Heather K. v. City of Mallard*, 887 F.Supp. 1249, 1258 (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir.1991)). Rather, as this court explained in its consideration of the "*Dataphase* factors" in *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224 (N.D.Iowa 1995),

Likelihood of success on the merits requires that the movant find support for its position in governing law. In order to weigh in the movant's favor, the movant's success on the merits must be "at least ... sufficiently likely to support the kind of relief it requests."

*Youngblade*, 878 F.Supp. at 1247 (citations omitted).

*Branstad*, 118 F.Supp.2d at 939; *accord B & D Land and Livestock Co. v. Veneman*, 231 F.Supp.2d 895, 906–07 (N.D.Iowa 2002) (quoting this section of *Branstad*). Thus, "likelihood of success on the merits" necessarily requires consideration of the law applicable to the plaintiff's claims.

### b. Applicable law

Recently, in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002), the United States Supreme Court explained that it had used the following three-step analysis of the constitutional validity of a municipal zoning ordinance regulating adult entertainment businesses in its prior decision in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986):

*First,* we found that the ordinance did not ban adult theaters altogether, but merely required that they be distanced from certain sensitive locations. The ordinance was properly analyzed, therefore, as a time, place, and manner regulation. *[Renton,* 475 U.S.], at 46, 106 S.Ct. 925, 89 L.Ed.2d 29. We *next* considered whether the ordinance was content neutral or content based. If the regulation were content based, it would be considered presumptively invalid and subject to strict scrutiny. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 115, 118, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230–231, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987). We held, however, that the Renton ordinance was aimed not at the content of the films shown at adult theaters, but rather at the secondary effects of such theaters on the surrounding community, namely, at crime rates, property values, and the quality of the city's neighborhoods. Therefore, the ordinance was deemed content neutral. *Renton, supra,* at 47–49, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29. *Finally,* given this finding, we stated that the ordinance would be upheld so long as the city of Renton showed that its ordinance was designed to serve a substantial government interest and that reasonable alternative avenues of communication remained available. 475 U.S., at 50, 106 S.Ct. 925, 89 L.Ed.2d 29. We concluded that Renton had met this burden, and we upheld its ordinance. *Id.,* at 51–54, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29.

*Alameda Books, Inc.,* 535 U.S. at 433–34, 122 S.Ct. 1728 (emphasis added). Thus, this court must likewise apply the *"Renton* analysis" and (1) determine whether the City's amended ordinances constitute a ban on "adult entertainment businesses," or only a "time place and manner regulation"; (2) determine whether the amended ordinances are "content neutral" or "content based"; and (3)(a) if the amended ordinances are found to be "content neutral," determine whether they are "designed to serve a substantial government interest" and whether "reasonable alternative avenues of communication remain available," or (b) if the amended ordinances are found to be "content based," apply "strict scrutiny" to determine the validity of the amended ordinances.

*c. Preliminary application of the law*

■ *i. "Ban" or "time, place, and manner" regulation?* As the Supreme Court has explained, an ordinance that does not ban adult businesses altogether, but merely requires that they be distanced from certain sensitive locations, *see Renton,* 475 U.S. at 46, 106 S.Ct. 925, or not allowed to concentrate, *see Alameda Books, Inc.,* 535 U.S. at 430 & 435, 122 S.Ct. 1728, is a "time, place, and manner" regulation. In the present case, the October 2003 amendments imposed a complete—albeit temporary—ban on new "adult" businesses. However, the amended ordinances now at issue, Sioux City Municipal Code 25.56.030 and the January 2004 amendments, only bar "adult entertainment businesses," as redefined, *from the General Business (BG) Zones,* not from the entire City. Because "adult entertainment businesses," however defined, are still permitted within General Business—Metropolitan (BG–M) zones, such as the downtown area, the regulations at issue here are "time, place, and manner" restrictions.

■ *ii. "Content neutral" or "content based"?* The next question, then, is whether the ordinances, as amended, are "content neutral" or "content based" at the second step of the *Renton* analysis. The

fundamental principle at issue at this stage of the analysis is the principle "that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" *Renton,* 475 U.S. at 48–49, 106 S.Ct. 925 (quoting *Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)). Thus, an ordinance is "content based" if it is "enacted for the purpose of restraining speech on the basis of its content." *See Renton,* 475 U.S. at 46–47, 106 S.Ct. 925. On the other hand, "'[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.'" *ILQ Investments, Inc. v. City of Rochester,* 25 F.3d 1413, 1416 (8th Cir. 1994) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)); *see also Renton,* 475 U.S. at 48, 106 S.Ct. 925 (considering whether the purpose of the ordinance is "unrelated to the suppression of free expression" and "*justified* without reference to the content of the regulated speech'") (quoting *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), with emphasis added in *Renton* ). Thus, "[c]ontent neutrality focuses on the City's purpose in enacting the ordinance." *Id.* (again citing *Ward,* 491 U.S. at 791, 109 S.Ct. 2746).

In *Renton,* the Supreme Court concluded that the ordinance at issue treated "adult motion picture theatres" differently from other kinds of theaters, but the ordinance was nevertheless "content neutral," because it was not aimed at the *content* of the films shown at the "adult motion picture theatres," but rather at the *secondary effects* of such businesses on the surrounding community. *Renton,* 475 U.S. at 47, 106 S.Ct. 925. The ordinance, "by its terms," was designed "to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views." *Id.* at 48, 106 S.Ct. 925.

██ In contrast, the 2004 amendments to the Sioux City ordinances defining "adult entertainment businesses" do not, by their terms, state *any* purpose to combat "secondary effects" of "adult entertainment businesses," or indeed, any purpose at all. To the contrary, the only evidence in the preliminary injunction record is that the series of amendments to the ordinances, beginning in October 2003, was in direct response to Doctor John's intention to open a store in Sioux City, Iowa, and, more specifically still, in direct response to Doctor John's statement of its intent to comply with existing requirements for businesses allowed to locate in a BG zone. *See* Plaintiff's Complaint, Exhibit C (November 11, 2003, Sioux City Journal article); Plaintiff's Complaint, Exhibit B (Request For City Council Action, noting that Doctor John's had communicated to the City Attorney its intent to comply with existing zoning regulations). Moreover, the shifting nature of the definition of "adult entertainment businesses"—to the point where a business selling *any* item of "adult media" and *any* item of "lingerie" would qualify as a "sex shop" within the meaning of Sioux City Municipal Ordinance 2004–0004(A–2)(m), Defendants' Summary Judgment Appendix at 31— when Doctor John's professed itself prepared to comply with existing limitations, is sufficient for this court to infer that the purpose of the amendments was to ban the Doctor John's store on the basis of its *content.*

Therefore, the court concludes that Doctor John's has a likelihood of showing that the amended ordinances are "content based," although the court will consider, in the alternative, whether Doctor John's has a likelihood of success on the merits of its claims if the amended ordinances are "content neutral."

*iii. Do the ordinances withstand the appropriate level of scrutiny?* Because the court finds that there are reasonable inferences that the amended ordinances are "content based," the court will first consider whether Doctor John's has a likelihood of success on the merits of a contention that the ordinances fail "strict scrutiny." As explained in *Alameda Books,* a "content based" ordinance is "presumptively invalid." *Alameda Books, Inc.,* 535 U.S. at 434, 122 S.Ct. 1728. That presumption, alone, should be sufficient to find that the "likelihood of success" *Dataphase* factor weighs in favor of a preliminary injunction, because the presumption establishes that there is support for Doctor John's position under controlling law and that Doctor John's success on the merits is sufficiently likely to warrant the relief it requests. *See Branstad,* 118 F.Supp.2d at 939; *accord B & D Land and Livestock Co.,* 231 F.Supp.2d at 906–07.

█ However, probing Doctor John's likelihood of success one step further, the court will consider whether Doctor John's has a likelihood of success on a claim that the amended ordinances fail "strict scrutiny." As the Supreme Court has repeatedly explained, "strict scrutiny" requires that, to be constitutionally valid, a regulation must be "narrowly tailored to serve a compelling state interest." *See, e.g., Republican Party of Minnesota v. White,* 536 U.S. 765, 775, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). Even assuming that the City has a "compelling interest" in its exercise of police powers to regulate adult enter-

tainment businesses to combat "secondary effects" of such businesses, the record at this point is absolutely devoid of any evidence that the amended ordinances are "narrowly tailored" to serve that purpose. Therefore, assuming that the ordinances are "content based," Doctor John's has sufficient likelihood of success on the merits to obtain an injunction against enforcement of the amended ordinances.

█ The answer is the same when the court considers, in the alternative, Doctor John's likelihood of success if the amended ordinances are "content neutral." In such a case, "[t]he appropriate inquiry ... is whether the [City's] ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." *Renton,* 475 U.S. at 50, 106 S.Ct. 925; *see also Alameda Books, Inc.,* 535 U.S. at 434, 122 S.Ct. 1728. A city is entitled to rely on findings from studies in other cities, before enacting such an ordinance, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *See Renton,* 475 U.S. at 51, 106 S.Ct. 925. To put it another way, "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest.'" *Alameda Books, Inc.,* 535 U.S. at 438, 122 S.Ct. 1728. However, "[t]his is not to say that a municipality can get away with shoddy data or reasoning." *Id.* Consequently, the burdens upon the parties are the following:

The municipality's evidence must fairly support the municipality's rationale for its ordinance. If the plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the

municipality meets the standard set forth in *Renton.* If the plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books, Inc.,* 535 U.S. at 438–39, 122 S.Ct. 1728.

The City now argues that the government interest for its amendments is the exercise of police power to regulate adult entertainment businesses to limit the "secondary effects" of such businesses. The court must agree that such an interest is probably "substantial." However, the record is absolutely devoid of any evidence that the City even considered the need to exercise police powers to combat or limit "secondary effects," so that the City has cited no evidence fairly supporting such a rationale for its amendments. *See id.* at 438, 122 S.Ct. 1728 (the municipality's initial burden is to point to evidence that fairly supports its rationale for the ordinance). While the City put on evidence that Mr. Nelson, the Senior Planner, reviewed some studies—which were not even put in evidence—as explained above, Mr. Nelson was not the person who either drafted or enacted the amended ordinances, and there is no evidence in the record that Mr. Nelson conveyed his understanding or summaries of the studies he examined to members of the City Council or to the City Attorney or conveyed the studies themselves to City Council members or to the City Attorney, and there is no evidence that the City Attorney or the City Council members independently reviewed any similar studies or other evi-

dence of the "secondary effects" of adult entertainment businesses at any time prior to amending Sioux City's zoning ordinances.

Furthermore, it became apparent that Mr. Nelson and the City's counsel believe that Doctor John's store would fall within the amended definition of a "sex shop," on the basis that the store would sell "adult videos" *and* "lingerie," *see* SIOUX CITY MUNICIPAL ORDINANCE 2004–0004(A–2)(m)(1), or on the basis that more than five percent of its stock-in-trade consists of sexually oriented toys or novelties.[6] SIOUX CITY MUNICIPAL ORDINANCE 2004–0004(A–2)(m)(2), Defendants' Summary Judgment Appendix at 31. However, neither Mr. Nelson nor the City's counsel could articulate at the preliminary injunction hearing any basis for a conclusion that selling "adult videos" and "lingerie" in one store, or selling such a relatively small percentage of total stock-in-trade in the form of sexually oriented toys or novelties, would have or would be likely to have the sort of "secondary effects" identified in studies mentioned by Mr. Nelson or described in decisions such as *Renton* and *Alameda Books.* At this point, the City appears to be relying on mere speculation regarding the potential for "secondary effects" of stores selling the sorts of products Doctor John's stocks, to justify a purportedly "content neutral" ordinance, if indeed the City was not simply targeting the content of Doctor John's business.

The court is equally unimpressed by the City's assertion, at the preliminary injunction hearing, that the three arrests of one of Doctor John's representatives on obscenity charges demonstrated that a concern about the "secondary effects" of a

---

6. The court is not convinced that the preliminary injunction record would even support an inference that more than five percent of Doctor John's store's stock-in-trade would consist

of sexually oriented toys or novelties, if the question were whether or not Doctor John's would fall within an otherwise valid ordinance.

store like Doctor John's was warranted. Again, the City has pointed to absolutely no evidence showing any rational connection between the arrest of a store representative on obscenity charges—which charges the court notes were disputed—and the specific definitions of a "sex shop" found in the City's amended ordinances.

Thus, there is support for Doctor John's position under controlling law and Doctor John's has shown that its likelihood of success on the merits is sufficiently likely on its contention that the amended ordinances fail the applicable level of scrutiny, whether the amended ordinances are "content based" or "content neutral," to warrant preliminary injunctive relief. *See Branstad,* 118 F.Supp.2d at 939; *accord B & D Land and Livestock Co.,* 231 F.Supp.2d at 906–07.

However, there are other *Dataphase* factors to consider.

### 2. Irreparable harm

■ The second *Dataphase* factor is "irreparable harm." *See, e.g., Dataphase,* 640 F.2d at 114. As this court has also explained,

> " 'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " *Bandag, Inc.,* 190 F.3d at 926 (quoting *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Id.; Adam–Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir.1996) (" '[T]he failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction.' ") (quoting *Gelco Corp. v. Coniston Partners,* 811 F.2d 414, 418 (8th Cir.1987)). Various considerations may

be relevant to a determination of "irreparable harm." For example, a movant's delay in seeking relief or objecting to the actions the movant seeks to enjoin "belies any claim of irreparable injury pending trial." *Hubbard Feeds v. Animal Feed Supplement,* 182 F.3d 598, 603 (8th Cir.1999). Moreover, an adequate showing of "irreparable harm" cannot be something that has never been the focus of the underlying lawsuit. *See United States v. Green Acres Enters., Inc.,* 86 F.3d 130, 133 (8th Cir.1996). A sufficient showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.,* 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir.1992). Even where money damages are available to compensate for some of the harm to the movant, other less tangible injuries cannot be so easily valued or compensated, so that the availability of money damages that do not fully compensate the movant do not preclude a preliminary injunction. *Glenwood Bridge,* 940 F.2d at 371–72.

*Branstad,* 118 F.Supp.2d at 941–42; *accord B & D Land and Livestock Co.,* 231 F.Supp.2d at 910 (also quoting this portion of *Branstad* ).

In the present case, the irreparable harm with which Doctor John's is threatened is both concrete economic harm in the form of a tangible loss of profits and a less tangible loss of good will and the still more intangible, but nevertheless real, harm from improper impingement upon First Amendment rights. No adequate remedy at law exists for any of these harms. *See id.* Solely because of the amended ordinances, Doctor John's is pre-

cluded from opening an otherwise legal business in its chosen location, when the evidence in the record is that Doctor John's Sioux City store is fully stocked and could be opened within two days. At least—indeed, perhaps more—importantly, the amended ordinances potentially impinge upon First Amendment rights, and such impingement is itself irreparable harm sufficient to sustain a preliminary injunction. *See, e.g., Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Marcus v. Iowa Public Television,* 97 F.3d 1137, 1140–41 (8th Cir.1996) (citing *Elrod* ). Therefore, this *Dataphase* factor also weighs in favor of a preliminary injunction.

### 3. Balance of harms

 This court has also explained the third "*Dataphase* factor," the "balance of harms," as follows:

> The next factor in the Dataphase analysis, the "balance of harms," requires the court to consider "the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." *Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926, 929 (8th Cir.1994). Whereas "irreparable harm" focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct, *Dataphase,* 640 F.2d at 114, the "balance of harm" analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. *Id.; see also Glenwood Bridge,* 940 F.2d at 372. Thus, an illusory harm to the movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall,*

974 F.2d at 1023. What must be weighed is the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction. *See Baker Elec. Co-op.,* 28 F.3d at 1473. Another consideration is whether the nonmovant has already voluntarily taken remedial action, which either eliminated or reduced the harm to the movant, or showed that such remedial action did not harm the nonmovant. *See Heather K.,* 887 F.Supp. at 1260.

*Branstad,* 118 F.Supp.2d at 942–43; *B & D Land and Livestock Co.,* 231 F.Supp.2d at 911 (also quoting *Branstad* ).

In this case, it is clear that the balance of harms also weighs in favor of Doctor John's. The harm to Doctor John's of allowing enforcement of amended ordinances that are potentially marred by constitutional deficiencies is clear and significant, and the harm to the City of enjoining such enforcement is slight at best. *Id.* The City, however, argues that a preliminary injunction is not appropriate, because such relief would not maintain the *status quo.* The essence of the City's argument is that Doctor John's was an "adult entertainment business" under the pre-existing ordinances just as it is now under the January 2004 amendments, and thus could not locate at its desired location under either version of the ordinances. That being so, the City argues that it is more harmed than Doctor John's would be by enjoining enforcement of the amended ordinances. This argument, however, is unsupported by the evidence presented at the preliminary injunction hearing.

More specifically, Doctor John's represented that it could and would comply with the predecessor ordinance, which is apparently what prompted the City to amend its ordinances to the point that Doctor John's

could not comply. The only evidence in the record is that Doctor John's store would not have violated the "25–percent rule" for an "adult book store" in the predecessor ordinance, because Ms. Bolton testified that 75 to 80 percent of the Sioux City store's entire stock-in-trade would be "non-adult" products. *See* SIOUX CITY MUNICIPAL CODE 25.04.020(A–2)(a) (an "adult book store" is "an establishment having a substantial portion [elsewhere defined as twenty-five percent or more] of its stock in trade" in "adult" media), Defendants' Summary Judgment Appendix at 9. On the other hand, it appears that Doctor John's stock of videos, which Ms. Bolton testified consisted almost entirely of "adult" videos, might have violated the "25–percent rule" for an "adult video store" under the predecessor ordinance, because the rule for "adult video stores" considered only the percentage of "video inventory" devoted to "adult" videos. *See* SIOUX CITY MUNICIPAL CODE 25.04.020(A–2)(c) (an "adult video store" is "an establishment which [has] a substantial portion [elsewhere defined as twenty-five percent or more] of its video inventory" in "adult" videos), Defendants' Summary Judgment Appendix at 9.[7] However, Ms. Bolton also testified that Doctor John's was willing to comply with the predecessor ordinance. Presumably, such compliance would have required Doctor John's to stock less than twenty-five percent of its video inventory in "adult" videos. There is also a provision in the ordinance as amended on January 12, 2004, that defines "Adult Media Store" in much the same way that the predecessor ordinance defined "adult video store." *See* SIOUX CITY MUNICIPAL ORDINANCE 2004–0024(c)(2) (an "Adult Media Store" is, *inter*

*alia,* an establishment that rents and/or sells media, and 25 percent or more of its media stock-in-trade consists of adult media), Attachment "A" to Defendants' Supplemental Brief. However, because Doctor John's represented that it was willing to comply with the predecessor ordinance in all respects, the court must assume, at least for the purposes of the motion for a preliminary injunction, that Doctor John's was also willing to comply with the comparable "Adult Media Store" provision of the amended ordinance, for example, by stocking seventy-five percent or more of its media stock-in-trade in "non-adult" media. Thus, the record evidence supports a conclusion that Doctor John's only falls within the definition of an "adult entertainment business," and hence is barred from a BG zone, by virtue of falling within the amended definition of a "sex shop." Enactment of that definition, again, potentially violates the First Amendment under both "strict" and "intermediate" scrutiny. Thus, the *status quo* that should be maintained by a preliminary injunction is the *status quo ante* potentially unconstitutional action by the City, that is, the status under a zoning regime with which Doctor John's apparently could and would have complied. Therefore, the "balance of harms" also clearly weighs in favor of granting Doctor John's the preliminary injunctive relief that it requests.

### 4. The public interest

Finally, the court turns to the last "*Dataphase* factor," the "public interest" factor, which this court has explained as follows:

> stores" in the predecessor ordinance, the court takes no position, at this time, on whether there is a constitutional infirmity in that difference.

---

7. While the court questions whether there is any rational basis for the difference in the way that the "25–percent rule" applies to the entire stock of "adult book stores," but only to the "video inventory" of "adult video

[C]onsideration of the "public interest" factor has frequently invited courts to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *See Heather K.*, 887 F.Supp. at 1260. However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, *see id.*, a preference for enjoining inequitable conduct, *see id.* at 1260 n. 16, and the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op.*, 28 F.3d at 1474.

*Branstad*, 118 F.Supp.2d at 943; *accord B & D Land and Livestock Co.*, 231 F.Supp.2d at 912 (also quoting *Branstad*).

The public interest that must be served here is not the public interest in enforcement of zoning ordinances by the City, but the greater, more fundamental public interest that the First Amendment to the United States Constitution is intended to serve. That interest can only be served in this case by enjoining enforcement of the amended ordinances, which are potentially constitutionally deficient. To put it another way, the public interest in this case, which plainly warrants issuance of a preliminary injunction on enforcement of the amended zoning ordinances, is the public interest in being protected from the "dangers to liberty [which] lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).[8]

Therefore, the court concludes that all four "*Dataphase* factors" weigh in favor of issuing a preliminary injunction in this case.

## C. Scope Of Injunctive Relief

The court gave Doctor John's the opportunity at the preliminary injunction hearing to reformulate the relief requested in light of Doctor John's oral amendment to its motion for a preliminary injunction to address the January 2004 amendments to the ordinances. However, notwithstanding that opportunity, it is not clear to the court that Doctor John's ever actually articulated the precise relief it was requesting, beyond barring enforcement of the amended ordinances. It appears to the court— from the record at the preliminary injunction hearing, the arguments of the parties, and the court's examination of the amended ordinances—that Doctor John's would be barred from its intended location under the amended ordinances *only* because it falls within the definition of a "sex shop" in those amended ordinances. This is so, because it appears that Doctor John's intends to sell both "adult videos" and "lingerie" in the same store, *see* SIOUX CITY MUNICIPAL ORDINANCE 2004–0004(A–2)(m)(1), and *may* intend that more than five percent of its stock-in-trade consist of sexually oriented toys or novelties, *see* SIOUX CITY MUNICIPAL ORDINANCE 2004–0004(A–2)(m)(2), Defendants' Summary Judgment Appendix at 31, although the evidence on this latter point is much more uncertain. Consequently, in order for Doctor John's to escape the prohibition on its conduct of business at its intended location, it would only be necessary to enjoin enforcement of the "sex shop" provisions of the amended ordinances.

However, the *constitutional defect* that the court finds is likely present in the amended ordinances is not so restricted. Rather, as explained above, the presump-

---

**8.** To the extent that the court has not expressly addressed in this ruling any arguments by the City against the preliminary injunction sought by Doctor John's, the court has considered and rejected those arguments in light of the record presented and applicable law.

tion of invalidity applies to the whole ordinance, because it appears to be a "content based" regulation, and, under "strict scrutiny," the record at this point is absolutely devoid of any evidence that the amended ordinances are "narrowly tailored" to serve the purposes of exercising police power to minimize "secondary effects." Similarly, even if the ordinances are "content neutral," the likely constitutional deficiency of complete lack of evidence that the City even considered the need to exercise police powers to combat or limit "secondary effects," and hence, the lack of evidence of a reasonable connection between the substantial governmental interest and the amendments, applies to the amended ordinances as a whole. Therefore, the court concludes that enforcement of the 2004 amendments in their entirety must be enjoined.[9]

### D. The Bond Requirement

■ Subsection (c) of Rule 65 of the Federal Rules of Civil Procedure expressly requires the movant to give security for the issuance of a preliminary injunction. *See* FED. R. CIV. P. 65(c). As this court has explained, "The bond posted under Rule 65(c) 'is a security device, not a limit on the damages the defendants may obtain against [the plaintiff] if the facts warrant such an award.'" *Branstad,* 118 F.Supp.2d at 944 (quoting *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.,* 130 F.3d 1305, 1309 (8th Cir.1997)). Furthermore,

> The Eighth Circuit Court of Appeals has warned that, "[a]lthough we allow the district court much discretion in setting

bond, we will reverse its order if it abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v. Xyquad, Inc.,* 939 F.2d 627, 632 (8th Cir.1991) (citing *Rathmann Group v. Tanenbaum,* 889 F.2d 787, 789 (8th Cir.1989)).

*Branstad,* 118 F.Supp.2d at 944; *accord B & D Land and Livestock Co.,* 231 F.Supp.2d at 913 (quoting this portion of *Branstad* ). Despite the clarity of the bond requirement under Rule 65(c), the court finds that parties fail to discuss this requirement in far more cases than they mention it. This case is in accord with the majority. Nevertheless, the court must consider the question.

■ It appears that Doctor John's, as a commercial entity, should be in a position to post a bond, if necessary, before a preliminary injunction will issue in this case. However, it is not clear to the court what, if any, monetary damages would be incurred by the City as the result of an improvident injunction in this case. Certainly, the City has not pointed to any evidence supporting a contention that the City will suffer compensable economic "secondary effects" if its amended ordinances are improvidently enjoined. Moreover, requiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent

---

**9.** The court notes that the 2004 amendments contain "repealer" clauses, which expressly repeal "[a]ll ordinances or parts of ordinances in conflict with the provisions of this [amended] ordinance." *See* SIOUX CITY MUNICIPAL ORDINANCE 2004–0004(6), Defendants' Summary Judgment Appendix at 32; SIOUX CITY MUNICIPAL ORDINANCE 2004–000024(4).

The court notes, further, that its injunction on enforcement of the amended ordinances does not negate the "repealer" clauses or reinstate the predecessor ordinances. Therefore, as a result of the present injunction, there appears to be no enforceable limitation on "adult entertainment businesses" in general business zones in Sioux City at this time.

upon an ability to pay. Therefore, under the circumstances presented in this case, the court will waive the bond requirement.

### III. CONCLUSION

Upon the foregoing, whether one favors or opposes the presence in this community of adult entertainment businesses in general, or Doctor John's business in particular, the City's attempts to amend its zoning ordinances in 2003 and 2004 are disappointing, either because they likely violated constitutional standards, or because they failed in their objectives where they cannot be enforced. Doctor John's January 5, 2004, Motion For Preliminary Injunction (docket no. 7), as orally amended on January 20, 2004, is granted, and enforcement of the City's January 2004 amendments to the zoning ordinances regarding "adult entertainment businesses" will be enjoined.

IT IS SO ORDERED.

### PRELIMINARY INJUNCTION

WHEREAS, this matter comes before the court pursuant to the January 5, 2004, Motion For Preliminary Injunction by plaintiff Doctor John's, Inc., as orally amended on January 20, 2004,

AND WHEREAS, the court finds that enforcement actions of the City of Sioux City, or any of its subdivisions or administrative departments, agents, or officials, pursuant to SIOUX CITY MUNICIPAL CODE 25.56.010 and SIOUX CITY MUNICIPAL CODE 25.56.030, employing the definition of "adult entertainment business" in Section 1(A–2) of Ordinance 2004–0004, adopted January 5, 2004, as amended on January 12, 2004, by Ordinance 2004–0024, would impose irreparable harm or injury or the threat of such irreparable harm or injury

upon the plaintiff herein, arising from a potential violation of the plaintiff's rights under the First Amendment to the United States Constitution, and upon further consideration of all other relevant factors,

THE CITY OF SIOUX CITY, and any of its subdivisions or administrative departments, agents, or officials, are hereby preliminarily enjoined from pursuing, instituting, continuing, or completing any and all enforcement actions pursuant to SIOUX CITY MUNICIPAL CODE 25.56.010 and SIOUX CITY MUNICIPAL CODE 25.56.030, employing the definition of "adult entertainment business" in Section 1(A–2) of Ordinance 2004–0004, adopted January 5, 2004, as amended on January 12, 2004, by Ordinance 2004–0024, until such time as this preliminary injunction is dissolved or vacated, by this court or a reviewing court.

This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

The bond provisions of Rule 65(c) of the Federal Rules of Civil Procedure are hereby waived, and this preliminary injunction shall issue immediately.

IT IS SO ORDERED.