**William E. HILL, Appellee,**

v.

**XYQUAD, INC., Terminal Software, Inc.; Gerald Claunch; Sylvan Landau; Frederick Stewart; James Tuxberry, Appellants.**

**Nos. 91–1274, 91–1842.**

United States Court of Appeals, Eighth Circuit.

Submitted June 12, 1991.

Decided July 29, 1991.

Rehearing Denied in No. 90–1274 Sept. 5, 1991.

Stephen L. Dreyfuss, Newark, N.J., argued (Rachel N. Davidson, Newark, N.J., and Messrs. Michael H. Wetmore and Alan E. Popkin, St. Louis, Mo., on the brief), for appellants.

Frank B. Janoski, argued (Timothy F. Noelker, on the brief), St. Louis, Mo., for appellee.

Before McMILLIAN, Circuit Judge, and FLOYD R. GIBSON and HENLEY, Senior Circuit Judges.

HENLEY, Senior Circuit Judge.

Xyquad, Inc., its predecessor entity and founders, collectively referred to as the appellant, appeals the issuance and terms of a preliminary injunction ordering it to return certain software programs to William E. Hill, appellee. Appellee sought the preliminary injunction to prevent appellant from continuing its alleged infringement of his copyright. Appellee also filed a suit for infringement. In connection with the injunction, the district court properly ordered appellee to post a reasonable pre-trial bond of $500,000.00 but later, without explanation, substantially reduced and drastically modified the bond requirement, permitting appellee to post the equity in his home instead.

We stayed the injunction and ordered appellant to post a bond of $1 million pending our further review and resolution of its appeal of the district court's order. Appellant agreed in the alternative, and we so ordered it, to return all copies of the software to the appellee with the exception of one copy deposited with the district court for safekeeping. We now lift our stay order, dissolve the preliminary injunction entirely, and remand this cause to the district court so that it can proceed toward ultimate disposition.

FACTS

We first summarize the relevant findings of the district court. Hill is a programmer

who developed three software programs for use by banking entities. He entered into an indefinite term, non-exclusive licensing agreement in 1987 with Xyquad's predecessor entity after discussing with its founders the possibility of going into business together. The company was to provide certain integral computer equipment and services to financial institutions.

The agreement provided that appellee was to receive monthly royalties and in exchange he would sublicense the programs and make himself available to handle problems with and upgrades of the programs. Appellee was to remain the owner of the programs, unless he died before termination of the agreement, in which case appellant became the owner. Appellee agreed to let appellant use the programs to develop business software applications for its clients, the end users. The end users were likewise authorized to use the programs within the context of the applications developed for it by the appellant.

The agreement could be terminated at will by appellant with ninety-days notice. Appellee could only terminate the agreement if appellant failed to pay the monthly royalty. The district court found that appellant had not terminated the agreement and had made all required payments. Upon termination, appellee was responsible for servicing end users if appellant became unable to do so and appellant was required to return all codes and programs to appellee.

Each program consisted of object codes (binary, machine-readable only codes) and source codes (human readable). Appellee was required to provide the object code to appellant, and appellant was permitted to distribute program applications to end users in object code. Appellee was specifically required to deliver a copy of the source codes and any upgrades to Mercantile Trust Company for safekeeping. Appellant was specifically precluded from sharing the source codes with end users. The district court found that appellee originally kept the source codes at appellant's place of business, though under his control, but later turned copies of the source codes over to appellant. The agreement required appellant to keep the programs (object and source codes) confidential from third persons with the exception of permitted disclosures to end users.

The district court found that appellee was the owner of the programs as evidenced by virtue of his copyright registrations in effect at February 9, 1990. The court also found that applications of these programs were operational at several locations throughout the United States. The parties had a "falling out" in early 1989 and appellee departed from appellant's business for a few weeks, leaving the programs behind. The district court found that appellee later returned to appellant's business after discussions regarding amendments to the licensing agreement, and gave appellant copies of the source codes. Shortly thereafter, however, appellee again departed, this time for good.

The district court found that appellant had only disclosed the source code to officers and employees of Xyquad, and to certain computer programmers it hired to correct and modify the source codes after appellee's departure. Also, sometime after departure, appellant removed appellee's name from the copyright disclosure notice on the programs. The court further found that the programs continued to have, as expected, certain "bugs" and "glitches" that needed correction and necessitated using the source codes. Appellee had not offered to perform these corrections after his last departure.

Appellee moved for preliminary injunction on May 23, 1990, and unsuccessful efforts were made towards settlement. The court held hearings on the injunction in October, November and December. On January 2, 1991, the court issued its decision granting the injunction and ordered briefs regarding an appropriate bond. Applying the Eighth Circuit test adopted in *Dataphase*, the district court found appellee would likely succeed on the merits of its underlying infringement action, that appellee would be irreparably harmed if the injunction was not granted, that the balance

of harms favored appellee, and that an injunction would benefit the public interest. *Dataphase Systems, Inc. v. C L Sys., Inc.,* 640 F.2d 109 (8th Cir.1981) (en banc).

The court stated that, although it was granting plaintiff relief, it would "not grant plaintiff immediate relief, and it [would] require the posting of a significant security bond to protect defendants' interests during the pendency of the litigation." The court then curiously ordered appellant to *immediately* cease all use of the source codes and to return all programs and codes to appellee within fifty days. As for bond, the appellant introduced evidence suggesting possible damages amounting to over $3 million. The court ordered bond of $500,-000.00. Upon motion for reconsideration, the court modified its order permitting appellee to post the unascertained equity in his home to secure the bond. We stayed the injunction, and appellant appeals both the district court's injunction and its bond order.

## APPLICABLE STANDARDS

■ We review an order granting preliminary injunction for an abuse of discretion, clear legal error, and clearly erroneous fact findings. *Id.* at 114; *accord West Pub. Co. v. Mead Data Cent. Inc.,* 799 F.2d 1219, 1223 (8th Cir.1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). In considering the district court's application of the aforementioned four factor test, a reviewing court must be mindful of the fact that no single factor is determinative. *Dataphase,* 640 F.2d at 113. The central question, however, in any preliminary injunction case is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* Each case is necessarily considered on its unique facts and circumstances.

## DISCUSSION

In its memorandum opinion, the district court first evaluated the probability of appellee's success on the merits. The district court concluded that the evidence showed appellee owned the programs, appellant's use of source code infringed upon appellee's copyright, and that no meritorious defenses existed. Next, the district court found irreparable harm based on the presumption of irreparable harm in copyright cases that was articulated in *West.* In addition, the court found that appellant's actions created a threat of improper distribution of the source codes, potential for damage to appellee's reputation, and potential exposure of appellee to legal liability. The court also cursorily concluded that the public interest most certainly was served by granting an injunction in this case.

■ For purposes of our analysis it is assumed, without deciding, that the district court's findings of fact and conclusions of law regarding factors one, two and four were not erroneous. However, we reverse because it does not appear that the court adequately balanced the harms and the evidence does not suggest that such balancing would favor appellee.

The district court found that appellee had left appellant's business and stopped servicing end users. This appears to be a clear breach of the agreement. Without appellee, appellant had no way within the terms of the agreement to service end user needs. The court concluded the programs had "bugs" and "glitches" that necessitated use of the source codes. The court stated that appellant had made all payments up to the present day that were required by the agreement despite appellee's breach and that the agreement had not been terminated. The district court did not dispute appellant's harms calculation, but simply reasoned that the significance of the balancing of harms factor, in light of the other factors that it had concluded favored appellee, was minimal.

The district court cited out of circuit authority to support its reasoning. *See Concrete Co. v. Classic Lawn Ornaments,* 843 F.2d 600 (1st Cir.1988); *Apple Computer, Inc. v. Franklin Computer Corp.,* 714 F.2d 1240 (3d Cir.1983), *cert. dismissed,* 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). The court suggested that infringers would be encouraged to base their entire business operations on a protected in-

tangible asset, thereby guaranteeing that the balance of harms would always come out in their favor.

Without debating the merits of this policy proposition or considering its use in this circuit, its application to the present case is inappropriate since, by specific agreement, both parties knowingly and willingly agreed to base a joint business venture entirely on copyrighted computer programs. Appellee's role within the business, along with his ability to control the source codes, protected against the infringement risk identified. Here, appellee chose to relinquish at least some of those protections. The trial court proceeded to note that application of the stated policy proposition was not always appropriate and that where "defendants face other harms equal to or greater than the threatened harm to plaintiff, such as loss of reputation and the destruction of the legitimate portions of their business, courts have come out differently." This is certainly such a case.

The court acknowledged that a sudden loss of the source codes would probably affect Xyquad's contracts with clients and its reputation. As stated, there was support for a claim of more than $3 million in probable damages to appellant. The court found that there was the possibility of unquantifiable future harm to appellee from misuse of the programs, potential third party liability, and risk to appellee's reputation. While these possible harms may or may not be irreparable, they do not withstand the evidence of appellant's probable harms. The district court simply failed to make the required findings showing the balance of the harms or to suggest any reason for which they might be balanced in favor of the appellee. *See Nutrition 21 v. Thorne Research, Inc.*, 930 F.2d 867, 869 (Fed.Cir.1991).

No evidence was introduced suggesting appellant's use of the programs differed from appellee's use of them while he was working with appellant. There was no evidence introduced of improper adulteration of the programs, of distribution to end users or others not working for appellant, or of any other misuse. The district court merely found a "threat" of some unquanti-fiable future injury. If this was the court's concern, it certainly could have fashioned a much more narrowly tailored order to protect appellee's interest.

As for possible harm to appellee's reputation or exposure to legal liability, such future harm is hard to imagine for two reasons. First, his name was removed from program applications commenced after his departure. Second, he was no longer personally involved in modifying the programs. The service contracts obligated appellant, not appellee; appellant was responsible for solving all future problems and was liable for failure to do so. No evidence was introduced suggesting either any basis for personal liability or that appellee enjoyed any particular reputation within the programming community.

■ One of the goals in an injunction case such as this is a return to the status that existed before the violative action occurred. *Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 590 (8th Cir.1984) (injunction issued to restore business activity). Appellee argues that the status quo is the state of affairs pre-infringement. We believe the true status quo in this case existed when both parties were complying with their licensing agreement: appellee was correcting and modifying source codes as needed, and appellant was servicing its clients. When the status quo is one of business activity and the alternative of "rest" causes irreparable harm, we have favored the activity. *Id.*

In a case which bears a close circumstantial resemblance to the present case, we affirmed the grant of an injunction preventing a patentee from obtaining his own injunction that would have interfered with a patent licensee's business and caused substantial irreparable harm. *Medtronic, Inc. v. Catalyst Research Corp.*, 664 F.2d 660 (8th Cir.1981). In that case, the agreement between the parties also contained ambiguities, the parties' actions similarly suggested a different interpretation of the contract than that argued by the patentee, and the balancing of the equities clearly favored the licensee. *Id.*

Finally, appellant argues the availability of equitable defenses it raised below, *also*

see *Lasercomb Am., Inc. v. Reynolds,* 911 F.2d 970, 976–77 (4th Cir.1990) (misuse of copyright defense available against copyright holder), and *Hiland Potato Chip Co. v. Culbro Snack Foods, Inc.,* 720 F.2d 981 (8th Cir.1983) (abandonment and estoppel defenses available against trademark holder), and its possible success on counterclaims that may result in a judgment that is satisfied through transfer of the copyrights to appellant. These arguments may not be without merit. We view the situation as much more complex than a simple case of copyright infringement.

By dissolving the injunction, we are leaving to the parties, under the watchful eye of the district court, the decision of whether and how to resume the full state of the original status quo. If such can be achieved through settlement, then so be it. If not, at least until the case can go to trial or other actions are ordered in a pre-trial proceeding, appellant shall be permitted to service its *existing* end users with or without the assistance of appellee. Appellee shall be allowed to return to his duties at appellant's business if such arrangement is deemed appropriate by the district court. We will leave it to appellee whether he wishes his name to be returned to the copyright disclosure on appellant's modified programs. Otherwise, both parties are expected to fully comply with the letter and intent of all other provisions of the licensing agreement.

As a final matter, even if the district court at a later time should specifically determine that the balancing of harms favors appellee and satisfies itself with regard to the other issues we have raised, before issuing another injunction it must arrive at a reasonable bond. It originally set bond at $500,000.00. By comparison, we had set bond at $1 million to secure our stay of the injunction. Appellant pleaded over $3 million in probable damages. The district court ultimately permitted appellee to post the equity in his home, purportedly worth $165,000.00, as bond. Appellee's financial institution, however, was unwilling to issue a bond guarantee letter for anything near that amount, and suggested a lower valuation.

In any event, the district court failed to make any findings regarding the final quality and amount of bond it was requiring and did not seek valuation of the equity in appellee's home. It suggested, instead, that it hoped its bond determination would encourage settlement. Although we allow the district court much discretion in setting bond, we will reverse its order if it abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations. *Rathmann Group v. Tanenbaum,* 889 F.2d 787, 789 (8th Cir.1989).

The stay will be lifted and the injunction dissolved. This matter is remanded to the district court with instructions to proceed with pre-trial matters and to take such other actions as it deems appropriate that are not inconsistent with this opinion.