**MCLEODUSA TELECOMMUNICATIONS SERVICES, INC., Plaintiff,**

v.

**QWEST CORPORATION and Qwest Communications Corporation, Defendants.**

No. C 05–0039–MWB.

United States District Court, N.D. Iowa, Cedar Rapids Division.

March 23, 2005.

Alan E. Fredregill, Heidman Redmond Fredregill Patterson Plaza Dykstra & Prahl, Sioux City, IA, Diane Kutzko, Mark L. Zaiger, Richard S. Fry, Shuttleworth & Ingersoll, Cedar Rapids, IA, Ky Elaine Kirby, Richard M. Rindler, Swidler Berlin Shereff Friedman, LLP, Washington, DC, for Plaintiff.

Amy L. Benson, Timothy R. Beyer, Brownstein, Hyatt & Farber, PC, Denver, CO, Amy M. Omvig, Dennis Wayne Johnson, Sheila K. Tipton, Dorsey & Whitney, Des Moines, IA; for Defendants.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER And TEMPORARY RESTRAINING ORDER

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................914
   A. Factual Background ......................................914
   B. Procedural Background ..................................917

II. LEGAL ANALYSIS ..........................................918
   A. Standards For A Temporary Restraining Order .........918
   B. Consideration Of The Dataphase Factors ..............919
      1. Likelihood of success on the merits ................919
         a. The nature of the requirement ..................919
         b. Application ....................................919
      2. Irreparable harm ..............................920
      3. Balance of harms .............................921
      4. The public interest ...........................922
   C. Rule 65's Bond Requirement .........................923
   D. Extension Of The Temporary Restraining Order .......924

III. CONCLUSION .............................................925

This is one of two lawsuits arising from a payment dispute between telecommunications companies, plaintiff McLeodUSA Telecommunications Services, Inc., and defendants Qwest Corporation and Qwest Communications Corporation. These parties provide each other with various services for initiation or completion of intrastate, interstate, wireless, wire-line, long-distance, and "toll free" (8YY) calls to and from each other's customers. Although the parties held litigation at bay pursuant to a standstill agreement, that agreement expired on February 23, 2005, and both McLeodUSA and Qwest Communications Corporation have filed lawsuits, McLeodUSA's in this court, and Qwest's in Colorado. In this action, McLeodUSA has now moved for a temporary restraining order or preliminary injunction to maintain the *status quo* pending judicial or other resolution of the parties' dispute.

## I. INTRODUCTION

### A. Factual Background

To understand the dispute leading to McLeodUSA's request for a temporary restraining order, a brief discussion of trade terminology and the relationship between the parties is necessary. This background is drawn primarily from McLeodUSA's Complaint, to which no answer has yet

been filed, and the documents in support of McLeodUSA's motion for a temporary restraining order or preliminary injunction.

The Telecommunications Act of 1996, 47 U.S.C. § 151, *et seq.*, subdivided local telephone companies (or "local exchange carriers") into two different groups: the former monopoly local telephone companies, which are termed incumbent local exchange carriers ("ILECs"), and new entrants to the local market, which are called competitive local exchange carriers ("CLECs"). *See* Richard E. Wiley, *et al., Communications Law 2004: Contentious Times in a Shifting Landscape*, 813 PLI/Pat 287, 300 (December 2004) (discussing telecommunications technology following passage of the 1996 Act). McLeodUSA is a CLEC. Among other things, McLeodUSA provides access service to various customers, including long distance carriers (technically known as interexchange carriers ("IXCs")) and wireless carriers (technically known as commercial mobile radio service carriers ("CMRS")). Defendant Qwest Corporation is an ILEC and Qwest Communications Corporation is an IXC providing long distance telephone services, including toll free services, to customers throughout the United States.

When a customer of a CMRS (wireless carrier) calls an IXC's (long distance carrier) customer, the CMRS must connect to the Public Switched Telephone Network ("PSTN"). The CMRS can *choose* to connect to the PSTN through either an ILEC or a CLEC. Therefore, as a CLEC, McLeodUSA would provide a means by which a CMRS can access the PSTN. When a CMRS customer that has chosen McLeodUSA to connect to the PSTN places a call, the call is routed through McLeodUSA's facilities to the IXC (long distance carrier).

A "toll free" call is a call in which the IXC's customer ("toll free customer") is the person called. This "toll free customer" is assigned an 8YY area code number—and calls to "toll free customers" are termed "8YY traffic." In the case of 8YY traffic, the "toll free customer" has agreed with the IXC to pay the IXC for the incoming call, typically at a set rate per minute. In such instances, the IXC is obligated to pay McLeodUSA for the access that enabled the toll free call to reach the IXC, and hence, ultimately reach the "toll free customer." Where the call originates from a wireless telephone, the call is routed from the CMRS's Mobile Telecommunications Switching Office ("MTSO") to a McLeodUSA facility (or "trunk") which connects the CMRS's MTSO to the McLeodUSA PSTN switch. If the call is a toll free call, the call is routed through McLeodUSA, and then, at the IXC's option, either directly to the IXC whose customer is being called or indirectly through the ILEC.

In this competitive market, McLeodUSA provides financial incentives to CMRSs and institutions (i.e. hotels, colleges, airports) in order to encourage them to do business with McLeodUSA rather than the incumbent ILEC. In return for an agreement of CMRSs or institutions to connect via McLeodUSA's facilities, McLeodUSA provides them a commission based on revenues McLeodUSA receives from providing access services to IXCs in connection with 8YY traffic direct to the IXC's customers. Therefore, in order to meet its contractual obligations with CMRSs committed to using McLeodUSA to connect, McLeodUSA bills and collects access charges for providing access services to IXCs in connection with the completion of long distance calls from the customers of other carriers to an IXC's toll free customers, including 8YY wireless calls.

McLeodUSA alleges that it has been providing both interstate and intrastate

access service to Qwest for years under federal and state tariffs or implied contracts. Complaint, Doc. No. 2, at ¶ 14. During that time, McLeodUSA has billed Qwest for inter- and intrastate access charges on a regular basis. Qwest paid these bills without objection until payment was due for access services billed in April 2004. Qwest refused to pay McLeodUSA for any access services, both provided under tariff and implied contract, billed by McLeodUSA during April and May of 2004. Qwest contends that McLeodUSA has improperly inserted itself as the "originator" of certain wireless calls and has improperly, or fraudulently, claimed origination access fees for wireless customers by billing Qwest as if McLeodUSA were actually the originator of the calls. For access services billed by McLeodUSA from June 2004 through November 2004, Qwest refused to pay approximately 50% of each bill. McLeodUSA contends the total amount billed, but unpaid, is approximately $5.5 million.

Since June 19, 2001, Qwest Communications Corporation has provided McLeodUSA with certain services pursuant to a Wholesale Services Agreement. Additionally, Qwest Communications Corporation provides certain services to McLeodUSA pursuant to tariff. Qwest bills McLeodUSA for the services that it provides both under the Wholesale Services Agreement and pursuant to tariff. When the parties failed to come to some agreement regarding Qwest's withholding of payment to McLeodUSA, on about September 30, 2004, McLeodUSA began to withhold amounts billed to it pursuant to the Wholesale Services Agreement. From September 30, 2004, through November 2004, McLeodUSA withheld approximately $3.8 million in payment due to Qwest in order to set-off the $5.5 million McLeodUSA alleges it was owed by Qwest.

In December 2004, McLeodUSA and Qwest entered into a standstill agreement by which they agreed to stop the withholding of payments from one another at least until the agreement expired on February 23, 2005. McLeodUSA alleges that, should Qwest resume withholding payments for McLeodUSA's services, it would impair McLeodUSA's cash flow to the point that it will threaten McLeodUSA's ability to continue providing services to its other customers, including residential consumers and small businesses. Upon the expiration of the standstill agreement, Qwest filed suit in Colorado state court, and McLeodUSA filed the present lawsuit in this federal court. McLeodUSA has since removed the Colorado action to Colorado federal court.

On March 18, 2005, in a letter to McLeodUSA on Qwest Communications letterhead, authored by Steven Hansen—identified as "Vice President–Carrier Relations, Worldwide Wholesale Markets"—Qwest asserted that McLeodUSA was in default of its payment obligations to Qwest, that McLeodUSA had failed to provide a previously requested security amount of $900,000.00 dollars, and that unless payment of both the past due amount of $836,083.72 and the $900,000.00 security deposit was made by 5:00 p.m. Mountain Standard Time on March 23, 2005, Qwest might immediately terminate the services it provides to McLeodUSA under the Wholesale Services Agreement. Motion for Temporary Restraining Order and/or Preliminary Injunction, Doc. No. 24, Exhibit D.

A second letter from Qwest to McLeodUSA, also dated March 18, 2005, and authored by Steven Hansen, stated that McLeodUSA continued to be in default for payment to Qwest for tariffed services and that the past due amount was $287,207.94. This letter demanded immediate payment

of the past due amount, and stated that "Qwest will suspend order activity and/or disconnect the referenced services if payment on the past due amount is not made within five (5) calendar days." Motion for Temporary Restraining Order and/or Preliminary Injunction, Doc. No. 24, Exhibit E. This letter also stated that McLeodUSA failed to provide Qwest with a $2,852,944.00 security deposit, which Qwest previously demanded be posted by November 29, 2004. Qwest, therefore, contended in the letter that it "may suspend order activity and/or disconnect the referenced services if payment on the past due amount is not made within thirty (30) calendar days." *Id.* The letter stated, further, that McLeodUSA would not receive any further notice prior to suspension of tariffed services, and that if tariffed services are suspended, Qwest would require full payment of all outstanding charges, the payment of late fees, *and* the posting of the security deposit before restoring services. *Id.*

In an affidavit submitted by McLeodUSA, McLeodUSA avers that it received the two letters discussed just above on Monday, March 21, 2005.

### B. Procedural Background

On February 24, 2005, Qwest Communications Corporation, one of the defendants in this matter, filed an action against McLeodUSA in the District Court, City and County of Denver, Colorado. Qwest Corporation, which is a party to McLeodUSA's lawsuit in this court, is not a party to the lawsuit in Colorado. McLeodUSA has since removed that action to the United States District Court for the District of Colorado ("Colorado Action") (Doc. No. 25). McLeodUSA has also represented that it will, on or about March 23, 2005, file a motion to dismiss the Colorado Action, or to transfer the Colorado Action to Iowa. McLeodUSA also represents that it has

advised the Qwest defendants of its intent to move to dismiss the Colorado Action.

On February 25, 2005, McLeodUSA filed its own Complaint in this court alleging the following eight causes of action: (1) declaratory judgment that McLeodUSA has not breached its payment obligations to Qwest; (2) breach of contract and/or tariff; (3) breach of implied contract under the constructive ordering doctrine; (4) action on open account; (5) breach of implied contract based on quantum meruit; (6) unjust enrichment; (7) prima facie tort under the Restatement (Second) of Torts § 870; and (8) declaratory judgment that Qwest is in breach of its contract to pay McLeodUSA for access services. *See* Complaint, Doc. No. 2. In its Statement Of Pendency Of Colorado Action, McLeodUSA avers that this lawsuit was filed less than twenty-four hours after Qwest Communication Corporation filed the Colorado Action. Qwest requested, and was granted, an extension of time until April 20, 2005, in which to file an answer to McLeodUSA's Complaint. (Doc. Nos. 10 & 11).

On March 22, 2005, McLeodUSA filed four documents with the court: (1) a First Amended and Verified Complaint (Doc. No. 21); (2) the Affidavit of Todd M. Lechtenberg ("Lechtenberg Affidavit") (Doc. No. 23); (3) a Motion for Temporary Restraining Order And/Or Preliminary Injunction and accompanying supportive memorandum (Doc. No. 24); and (4) Plaintiff's Statement of Pendency of Colorado Action (Doc. No. 25). In essence, McLeodUSA's Motion for Temporary Restraining Order And/Or Preliminary Injunction requests the court prevent Qwest from terminating its services to McLeodUSA as threatened by the March 18, 2005, letters.

The court heard telephonic oral argument on McLeodUSA's Motion for Temporary Restraining Order And/Or Preliminary Injunction on March 23, 2005. At the

hearing, McLeodUSA was represented by Ky Elaine Kirby, who argued the motion, and Richard M. Rindler of Swidler, Berlin, Shereff, Friedman, L.L.P., in Washington, D.C., and by local counsel Diane Kutzko and Richard S. Fry of Shuttleworth & Ingersoll in Cedar Rapids, Iowa. Qwest Corporation and Qwest Communications Corporation were represented by Amy L. Benson of Brownstein, Hyatt & Farber, P.C., in Denver, Colorado, who argued the motion, and by local counsel Dennis Wayne Johnson and Sheila K. Tipton of Dorsey & Whitney in Des Moines, Iowa, and Qwest's in-house counsel Kevin Magnusson, Doug Shiao, and Lauren Schmidt. The arguments were lively and informative. The court must now provide expedited consideration to McLeodUSA's request for a temporary restraining order.

## II. LEGAL ANALYSIS

### A. Standards For A Temporary Restraining Order

As this court explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders[1] are generally measured against the standards set forth in *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir.1981) (*en banc*). *See Doctor John's, Inc. v. City of Sioux City, Iowa,* 305 F.Supp.2d 1022, 1033–34 (N.D.Iowa 2004); *Branstad v. Glickman,* 118 F.Supp.2d 925, 937 (N.D.Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F.Supp. 1405, 1411 (N.D.Iowa 1996). These factors include (1) the movant's probability of success on the merits, (2) the threat of irreparable harm to the movant absent the injunction, (3) the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Doctor John's, Inc.,* 305 F.Supp.2d at 1033; *Branstad,* 118 F.Supp.2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir. 2000)); FED. R. CIV. P. 65(b)(1).

" 'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.' " *Entergy, Ark., Inc.,* 210 F.3d at 898 (quoting *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175,

1. In *Branstad,* this court also discussed in some detail the differences between a temporary restraining order and a preliminary injunction. *See Branstad,* 118 F.Supp.2d at 935–937. Suffice it to say that, in that case, the court found the following factors should be considered to distinguish a TRO from a preliminary injunction: (1) whether the hearing was *ex parte* or adversarial; (2) whether the adversarial hearing allowed the basis for the relief requested to be strongly challenged; (3) whether the order expired, by its own terms, within the ten days provided by Rule 65(b); and (4) the "substance" of the order. *Id.* In this case, the court held an "adversarial" rather than an *ex parte* conference with the parties, but it did not hold the sort of "adversary hearing," including presentation of evidence beyond the affidavits and exhibits filed with McLeodUSA's motion and by Qwest in response, that allowed the basis for the requested order to be "strongly challenged," such that it would be " 'particularly unjustified' " to classify the resulting order as a temporary restraining order. *See id.* at 936 (quoting *Sampson v. Murray,* 415 U.S. 61, 87, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). Moreover, the court has every intention that this order for injunctive relief will expire in ten days, unless within that time, good cause is shown for extending it for a like period. *Id.* (citing FED. R. CIV. P. 65(b)). Finally, the "substance" of this order is intended to be a temporary restraining order, rather than a preliminary injunction, not least because of the expedited nature of the proceedings and ruling and the limited nature of the relief that will be granted. *Id.* (citing *Baker Elec. Coop. v. Chaske,* 28 F.3d 1466, 1472 (8th Cir.1994)). Therefore, this order is a temporary restraining order, not a preliminary injunction. *Id.*

1179 (8th Cir.1998)). The court assumes that it has the same discretion when ruling on a request for a temporary restraining order. As the Eighth Circuit Court of Appeals has also explained,

> These factors are not a rigid formula. However, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996).

*Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir.1999); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994) ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

The court will, therefore, consider each of the *Dataphase* factors in turn, to determine whether McLeodUSA has established that the balance of the *Dataphase* factors weighs in favor of issuance of a temporary restraining order in this case.

## B. Consideration Of The Dataphase Factors

### 1. Likelihood of success on the merits

#### a. The nature of the requirement

In prior cases, this court has explained the meaning of "likelihood of success on the merits" in the context of a motion for a preliminary injunction as follows:

> "[A]t the early stage of a preliminary injunction motion, the speculative nature of this particular ['likelihood of success'] inquiry militates against any wooden or mathematical application of the test. Instead, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir.1998) (internal citations and quotation marks omitted). Thus, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Heather K. v. City of Mallard*, 887 F.Supp. 1249, 1258 (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir.1991)). Rather, as this court explained in its consideration of the "*Dataphase* factors" in *Curtis 1000, Inc. v. Youngblade*, 878 F.Supp. 1224 (N.D.Iowa 1995),

> Likelihood of success on the merits requires that the movant find support for its position in governing law. In order to weigh in the movant's favor, the movant's success on the merits must be "at least ... sufficiently likely to support the kind of relief it requests."

*Youngblade*, 878 F.Supp. at 1247 (citations omitted).

*Branstad*, 118 F.Supp.2d at 939; *accord Doctor John's, Inc.*, 305 F.Supp.2d at 1034 (quoting this section of *Branstad*); *B & D Land and Livestock Co. v. Veneman*, 231 F.Supp.2d 895, 906–07 (N.D.Iowa 2002) (also quoting this section of *Branstad*). Thus, "likelihood of success on the merits" necessarily requires consideration of the law applicable to the plaintiff's claims.

#### b. Application

Here, McLeodUSA relies on several rulings of the Federal Communications Commission as supporting its contentions that the rates it charged Qwest for its

services were reasonable, that Qwest was required to pay the full amounts charged to it by McLeodUSA, and that Qwest was not entitled to withhold its payments. Similarly, McLeodUSA has relied on contract and implied contract theories to establish that it was entitled to "defensively" withhold its own payments to Qwest for services provided by Qwest. While Qwest asserts that there is also sufficient basis to find that McLeodUSA cannot, ultimately, prevail on the merits of its claims, the court cannot resolve the merits of the underlying dispute simply to determine whether or not temporary relief is appropriate; indeed, this court is "not deciding whether the movant for [a temporary restraining order] will ultimately win." *Id.*

■ Rather, "likelihood of success on the merits," for purposes of a temporary restraining order, means only that "the movant find support for its position in governing law." *Id.* There is sufficient support for McLeodUSA's position under governing law, as cited by McLeodUSA, to find that McLeodUSA has the necessary "likelihood of success on the merits" to warrant temporary relief. *See id.* Moreover, " 'at the early stage of a [temporary restraining order] motion, the speculative nature of this ["likelihood of success"] inquiry militates against any wooden or mathematical application of the test' " in favor of a " 'flexibl[e] weigh[ing of] the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.' " *Id.* (quoting *United Indus. Corp.*, 140 F.3d at 1179). Under the circumstances of this case, the ultimate determination of the merits will be a very fact-intensive process. In the meantime, McLeodUSA's contentions are at least plausible for the court to intervene to maintain the *status quo* until the merits can be reached. *Id.* Finally, the determination of whether or

not to issue a temporary restraining order does not depend solely upon the movant's "likelihood of success on the merits," but upon the balancing of all of the pertinent *Dataphase* factors. *See Baker Elec. Co-op., Inc.*, 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction") (internal quotation marks and citations omitted). Here, this *Dataphase* factor is at worst neutral and at best weighs in favor of issuance of a temporary restraining order.

### 2. *Irreparable harm*

The second *Dataphase* factor is "irreparable harm." *See, e.g., Dataphase*, 640 F.2d at 114. As this court has also explained,

> " 'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " *Bandag, Inc.*, 190 F.3d at 926 (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Id.; Adam–Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 299 (8th Cir.1996) (" '[T]he failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction.' ") (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987)). Various considerations may be relevant to a determination of "irreparable harm." For example, a movant's delay in seeking relief or objecting to the actions the movant seeks to enjoin "belies any claim of irreparable injury pending trial." *Hubbard Feeds v. Animal Feed Supplement*, 182 F.3d 598, 603 (8th Cir.1999). Moreover, an adequate showing of "irreparable harm" cannot be

something that has never been the focus of the underlying lawsuit. *See United States v. Green Acres Enters., Inc.*, 86 F.3d 130, 133 (8th Cir.1996). A sufficient showing on this factor can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.*, 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *See Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir.1992). Even where money damages are available to compensate for some of the harm to the movant, other less tangible injuries cannot be so easily valued or compensated, so that the availability of money damages that do not fully compensate the movant do not preclude a preliminary injunction. *Glenwood Bridge*, 940 F.2d at 371–72.

*Branstad*, 118 F.Supp.2d at 941–42; *accord Doctor John's, Inc.*, 305 F.Supp.2d at 1039 (quoting this portion of *Branstad*); *B & D Land and Livestock Co.*, 231 F.Supp.2d at 910 (also quoting this portion of *Branstad*).

█ In the present case, the affidavit of Todd M. Lechtenberg, submitted by McLeodUSA in support of its Motion For Temporary Restraining Order And/Or Preliminary Injunction, as supplemented by other exhibits submitted with McLeodUSA's motion, provides sufficient basis for a finding of irreparable harm to McLeodUSA in the absence of injunctive relief. Here, there has been no delay on McLeodUSA's part in seeking to enjoin Qwest's actions that might "belie" McLeodUSA's claim of irreparable injury. *See Branstad*, 118 F.Supp.2d at 942. Rather, until February 23, 2005, the parties' dispute was "on hold" pursuant to their standstill agreement. It was not until that standstill agreement expired and Qwest actually began withholding payments again and reiterating demands for payment and

deposits that McLeodUSA was realistically faced with the need to seek injunctive relief. Furthermore, it is clear that McLeodUSA has no adequate remedy at law, should Qwest terminate its services, in light of the potential for interruption of McLeodUSA's services to its customers, the adverse impact on its cashflow, and the difficulties that it would have in obtaining adequate alternative services within any reasonable timeframe to prevent collapse of its system. *Id.* Finally, the intangible injuries that McLeodUSA would suffer should Qwest cease providing services to McLeodUSA, arising from the interruption of McLeodUSA's services to its clients, cannot possibly be fully compensated by money damages at some uncertain date in the future. *Id.*

Thus, the "irreparable harm" *Dataphase* factor weighs strongly in favor of the relief McLeodUSA requests in its Motion For Temporary Restraining Order.

### 3. Balance of harms

As this court explained in *Branstad*,

The next factor in the *Dataphase* analysis, the "balance of harms," requires the court to consider "the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir.1994). Whereas "irreparable harm" focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct, *Dataphase*, 640 F.2d at 114, the "balance of harm" analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. *Id.; see also Glenwood Bridge*, 940 F.2d at 372. Thus, an illusory harm to the

movant will not outweigh any actual harm to the nonmovant. *Frank B. Hall*, 974 F.2d at 1023. What must be weighed is the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction. *See Baker Elec. Co-op.*, 28 F.3d at 1473. Another consideration is whether the nonmovant has already voluntarily taken remedial action, which either eliminated or reduced the harm to the movant, or showed that such remedial action did not harm the nonmovant. *See Heather K.*, 887 F.Supp. at 1260.

*Branstad*, 118 F.Supp.2d at 942–42; *accord Doctor John's, Inc.*, 305 F.Supp.2d at 1040 (quoting *Branstad*); *B & D Land and Livestock Co.*, 231 F.Supp.2d at 911 (also quoting *Branstad*).

■ Here, as explained above, the threat to McLeodUSA's rights, including its economic interests, is substantial. *See id.* at 943. This harm is not "illusory," but real and immediate. *Id.* On the other hand, Qwest has not convinced the court that it will suffer any comparable economic or other harm from an injunction that, in essence, reinstates the *status quo* under the parties' standstill agreement. *Id.* Finally, the court does not find that Qwest has taken any remedial action that would eliminate or reduce the harm to McLeodUSA; rather, Qwest has pressed its claims and demands for payment and deposits. *Id.*

Thus, the "balance of harms" *Dataphase* factor also weighs in favor of immediate, albeit temporary, injunctive relief.

#### 4. *The public interest*

The last *Dataphase* factor the court must consider is the "public interest." *Entergy, Ark., Inc.*, 210 F.3d at 898; *Bandag, Inc.*, 190 F.3d at 926; *Iowa Right to Life Committee, Inc.*, 187 F.3d at 966. In *Branstad*, this court observed,

[C]onsideration of the "public interest" factor has frequently invited courts to indulge in broad observations about conduct that is generally recognizable as costly or injurious. *See Heather K.*, F.Supp. at 1260. However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, *see id.*, a preference for enjoining inequitable conduct, *see id.* at 1260 n. 16, and the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op.*, 28 F.3d at 1474.

*Branstad*, 118 F.Supp.2d at 943; *accord Doctor John's, Inc.*, 305 F.Supp.2d at 1042 (quoting *Branstad*); *B & D Land and Livestock Co.*, 231 F.Supp.2d at 912 (also quoting *Branstad*).

■ Here, there is plainly a substantial public interest in maintaining telecommunication services to McLeodUSA's customers, notwithstanding the dispute between the parties. Indeed, maintenance of telecommunications services at fair costs is the purpose of FCC oversight and telecommunications regulatory legislation. *See, e.g.*, 47 U.S.C. § 151 (the FCC is to consider the public interest in light of the overall purpose of the Communications Act "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges...."). Thus, the potential interruption of services resulting from Qwest's conduct, if not enjoined, would be contrary to the public interest. Qwest counters that the public interest will not be served if McLeodUSA is treated differently than other customers who do not pay their bills. However, the court finds this argument unconvincing, not least because McLeodUSA *has* paid its bills to Qwest, pursuant to

the standstill agreement, and because Qwest has already shown that it considered that the interests that motivated the standstill agreement outweighed the supposed public interest in terminating services to McLeodUSA.

Thus, this final *Dataphase* factor also weighs in favor of issuance of a temporary restraining order. Because all of the pertinent factors weigh in favor of issuance of a temporary restraining order in this case, such a temporary restraining order will issue.

### C. Rule 65's Bond Requirement

Because the court finds that it is proper, upon balancing the "*Dataphase* factors" in the circumstances presented here, to issue a temporary restraining order, the court turns to the question of security for its issuance. Rule 65(c) provides, in pertinent part, as follows:

> **(c) Security.** No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

FED. R. CIV. P. 65(c). The bond posted under Rule 65(c) "is a security device, not a limit on the damages the defendants may obtain against [the movant] if the facts warrant such an award." *Minnesota Mining & Mfg. Co. v. Rauh Rubber, Inc.,* 130 F.3d 1305, 1309 (8th Cir.1997). The Eighth Circuit Court of Appeals has warned that, "[a]lthough we allow the district court much discretion in setting bond, we will reverse its order if it abuses that discretion due to some improper purpose, or otherwise fails to require an adequate bond or to make the necessary findings in support of its determinations." *Hill v.*

*Xyquad, Inc.,* 939 F.2d 627, 632 (8th Cir. 1991) (citing *Rathmann Group v. Tanenbaum,* 889 F.2d 787, 789 (8th Cir.1989)). In *Rathmann Group v. Tanenbaum,* 889 F.2d 787 (8th Cir.1989), the Eighth Circuit Court of Appeals determined that the district court abused its discretion by not requiring a bond in addition to the $10,000.00 already posted on the issuance and continuation of a temporary restraining order, which can be read to mean that the bond for a preliminary injunction was mandatory even where a previous bond for a temporary restraining order was in place. *Rathmann Group,* 889 F.2d at 789. On the other hand, the court cited as support for its decision to remand, *Roth v. Bank of the Commonwealth,* 583 F.2d 527, 539 (6th Cir.1978), which found error, according to the *Rathmann Group* court, "not because [the] trial court failed to require a bond in any particular amount, but because [the] court failed to exercise discretion required by Rule 65(c) by expressly considering [the] question of requiring [a] bond," *id.,* which suggests that whether or not a bond is required is in the discretion of the court.

In this case, Qwest demands a bond in the amount of approximately $3 million for an initial ten-day temporary restraining order, or double that, if the court extends the temporary restraining order for an additional ten days. Qwest bases this figure on its contention that the services it will be compelled to provide to McLeodUSA under the temporary restraining order, which it would otherwise terminate, would cost McLeodUSA approximately $15.9 million for a two-month period. Thus, the bond it demands for a ten-day continuation of services is one-sixth of the sum for two months. McLeodUSA counters that Qwest has already withheld $1.7 million more than McLeodUSA has withheld, McLeodUSA is otherwise current on all of its other bills to Qwest,

and that Qwest itself has estimated the costs of its services to McLeodUSA for two months to be $3.8 million, not $15.9 million. Thus, McLeodUSA contends that Qwest's demand for a bond in the amount of $3 million is plainly excessive. Qwest replies that it has other offsets against the $1.7 million it purportedly withheld in excess of what McLeodUSA owed for the services presently in dispute. Qwest also points out that McLeodUSA has made public disclosures of its financial difficulties, so that Qwest has reasonable concerns that it will never be paid for services provided under the temporary restraining order.

The court finds that there is insufficient basis in the present record to find that Qwest will actually be out any money for costs and damages incurred by Qwest if it is "found to have been wrongfully enjoined or restrained" to continue its services to McLeodUSA and to make full payments for services it obtains from McLeodUSA. *See* FED. R. CIV. P. 65(c) (purpose of bond). Certainly, Qwest's demand for a bond in the amount of $3 million for ten days of service that it must provide pursuant to the temporary restraining order are out of proportion to Qwest's own estimates of the cost for two months of the services to McLeodUSA *at issue here,* as elsewhere indicated in the record. Moreover, Qwest does not dispute that McLeodUSA was making full payment on its bills from Qwest while the parties were operating under their standstill agreement. Qwest does not appear to the court to be under any greater risk of non-payment for services provided under the temporary restraining order than it was for payment for services under the standstill agreement. Although the court will revisit the question of an appropriate bond for any preliminary injunction, the court concludes, in its discretion, that no bond should be required for the issuance of a temporary restraining order that maintains the *status quo* the

parties agreed to under the standstill agreement without any bond, deposit, or other security. *See Rathmann Group,* 889 F.2d at 789 (suggesting that whether or not a bond is required is in the discretion of the trial court).

### D. Extension Of The Temporary Restraining Order

Rule 65(b) provides that a temporary restraining order that was "granted without notice ... shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes." FED. R. CIV. P. 65(b). The present temporary restraining order is not "granted without notice," but the court will, nevertheless, assume that the ten-day limitation also applies. Therefore, a temporary restraining order entered today would ordinary expire on April 2, 2005. Rule 65(b), however, also provides that the temporary restraining order may "for good cause [be] extended for a like period." *Id.* (providing that a temporary restraining order may be extended "for a longer period" upon consent of the party against whom it is entered). The court discussed with the parties the necessity of extending the temporary restraining order for a period in excess of ten days, because the undersigned is scheduled to be out of the country, then to try one criminal trial immediately upon his return, followed shortly thereafter by a four-month federal death-penalty trial, making it difficult, if not impossible, to hold a preliminary injunction hearing within ten days. Consequently, the court stated that it intended to extend the temporary restraining order for an additional ten days to and including April 12, 2005. Hearing no objection, the court finds good cause to extend the initial ten days for this temporary restraining order for a "like period" of ten days, to and including April 12, 2005.

### III. CONCLUSION

Upon the foregoing, the court concludes that McLeodUSA's March 22, 2005, Motion for Temporary Restraining Order And/Or Preliminary Injunction (Doc. No. 24) should be, and hereby is, **granted** to the extent that the court will issue the attached temporary restraining order.

**A hearing** on McLeodUSA's Motion For Preliminary Injunction **shall be held at 8:00 a.m. on Saturday, April 9, 2005, in the third floor courtroom of the Federal Courthouse in Sioux City, Iowa.**

**IT IS SO ORDERED.**

### TEMPORARY RESTRAINING ORDER

**WHEREAS,** this matter came before the court pursuant to the March 22, 2005, Motion for Temporary Restraining Order And/Or Preliminary Injunction (Doc. No. 24) of plaintiff McLeodUSA Telecommunications Services, Inc. (McLeodUSA),

**AND WHEREAS,** pursuant to Rule 65 of the Federal Rules of Civil Procedure, the court finds that termination by Qwest Corporation and/or Qwest Communications Corporation of services to McLeodUSA; imposition of a security requirement upon McLeodUSA; the withholding of further amounts by Qwest in set off against McLeodUSA invoices; and failure of any of the parties to make full payment of their current and future invoices from one another would impose irreparable harm or injury or the threat of such irreparable harm or injury upon McLeodUSA, and upon further consideration of all other relevant factors,

**DEFENDANTS QWEST CORPORATION and QWEST COMMUNICATIONS CORPORATION** are hereby **temporarily restrained** from (1) terminating or threatening to terminate services to McLeodUSA or requiring security from McLeodUSA as a precondition to the start or continuation of any such services; (2) withholding any further amounts in set off against McLeodUSA invoices; and (3) failing to make full payment of their current and future invoices to McLeodUSA until expiration of this temporary restraining order. **Plaintiff McLeodUSA** is likewise required to make full payment of its current and future invoices from Qwest Corporation or Qwest Communications Corporation until expiration of this temporary restraining order.

The court finds good cause for extension of this temporary restraining order for an additional ten days beyond the initial ten days a temporary restraining order may remain in force pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, owing to scheduling conflicts with other equally urgent matters. Therefore, this temporary restraining order shall remain in full force and effect **to and including April 12, 2005,** or until such time as this temporary restraining order is dissolved or vacated, by this court or a reviewing court.

This temporary restraining order shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of this order.

This temporary restraining order shall issue without the posting of any bond, as the court finds insufficient evidence that either Qwest Corporation or Qwest Communications Corporation will incur any costs and damages incurred if they are "found to have been wrongfully enjoined or restrained" to continue their services to McLeodUSA and to make full payments for services they obtain from McLeodUSA. *See* FED. R. CIV. P. 65(c) (purpose of bond).

**IT IS SO ORDERED.**