# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

No. 06-6051EM

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| President Casinos, Inc., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| President Casinos, Inc., President | * | |
| Riverboat Casino-Missouri, Inc., | * | Appeal from the United States |
| Official Creditors Committee for | * | Bankruptcy Court for the Eastern |
| President Riverboat Casino-Missouri, | * | District of Missouri |
| Inc., | * | |
| | * | |
| Plaintiffs - Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| Columbia Sussex Corporation, and | * | |
| Wimar Tahoe Corp., | * | |
| | * | |
| Defendants - Appellants. | * | |

_____

Submitted: December 7, 2006
Filed: January 11, 2007

_____

Before KRESSEL, Chief Judge, FEDERMAN, and VENTERS, Bankruptcy
Judges.

_____

VENTERS, Bankruptcy Judge.

This is an interlocutory appeal of the bankruptcy court's order denying the Defendants' motion to modify a preliminary injunction. Specifically, the Defendants appeal the bankruptcy court's decision not to increase the amount of the bond required of the Plaintiffs. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(b). For the reasons set forth below, we affirm the decision of the bankruptcy court.[1]

## I. STANDARD OF REVIEW

Determinations of the amount and sufficiency of a bond rest within a court's discretion and will not be disturbed on appeal in the absence of an abuse of that discretion.[2] An abuse of discretion will be found when the court fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous.[3]

## II. BACKGROUND

Beginning in 1994, President Casinos, Inc., which owns the Admiral Casino ("Casino"), used a parcel of land near the Casino, known as the "Cherrick Lot," as a parking lot for casino patrons. At that time, the Cherrick Lot was owned by the Cherrick family. After 2001, when the Casino was moved to its current location across the street from the Cherrick Lot, the Casino used it as the Casino's principal self-parking lot. The Casino had an arrangement with the lessee–operator of the lot, St. Louis Parking, to pay $1.50 per car parked there by the Casino's patrons. Approximately 75% of the Casino's self-parking customers use the Cherrick Lot, and approximately 60% of its total customers use that lot; the rest of the customers either valet park or use other parking facilities. About 40,000 Casino patrons park in the Cherrick Lot each month. Thus, at $1.50 per car, the Casino paid approximately $60,000 per month to St. Louis Parking.

---

[1] The Honorable Kathy Surratt-States, United States Bankruptcy Judge for the Eastern District of Missouri.

[2] *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991).

[3] *Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 825 (8th Cir.2004).

President Casinos, Inc., and its parent corporation, President Riverboat Casino-Missouri, Inc. (collectively, "Debtors"), filed their voluntary petitions for reorganization in 2002. In October 2004, Columbia Sussex, through its wholly owned subsidiary, Wimar Tahoe (collectively, "Defendants"), bought the Cherrick Lot from the Cherrick family. Wimar Tahoe leased the Cherrick Lot to St. Louis Parking, which continued to operate it.

Although the Debtors and the Defendants did not have a written agreement, the Debtors continued to pay St. Louis Parking $1.50 per validated receipt until December 16, 2005, when the Defendants faxed a letter to the Casino saying that they had terminated the lease with St. Louis Parking and that they were raising the validation rate from $1.50 to $6 per car. A week later, on December 22, the Defendants notified the Casino that they were raising the validation rate to $10 per car. The Defendants also notified the Casino that the rate would be $20-25 per car on dates of special events, such as football games and New Year's Eve.

Notwithstanding these notices, the Casino continued to validate its patrons' parking receipts for a while, and the Defendants continued to honor the validations when the patrons presented them upon leaving the Lot, but the Casino did not pay the Defendants the increased validation rates. On December 30, 2005, the Defendants posted a notice at the lot notifying patrons that they were no longer accepting validations from the Casino and that all patrons had to pay the $10 parking fee up front.

The Casino stopped validating parking receipts on December 31, 2005, and on January 12, 2006, the Debtors and the Official Unsecured Creditors' Committee filed

3

the underlying adversary proceeding for breach of contract, *prima facie* tort,[4] and injunctive relief under 11 U.S.C. § 105, alleging that the Defendants' unilateral price increase was not based on any legitimate business purpose but was a means of forcing the Casino to buy the Lot on terms dictated by the Defendants.

On January 17, 2006, over the Defendants' objection, the bankruptcy court granted the Plaintiffs' application for a temporary restraining order, ordered the Defendants to honor the Casino's parking validations, and ordered that they could charge the Casino only $1.50 per car. The TRO required the Plaintiffs to pay the Defendants for unpaid validations to date (at the increased rates dictated by the Defendants on December 16 and 22, 2005) and to post a bond of $525,000. The record contains little information regarding the bankruptcy court's calculation of the bond amount.[5]

On January 27, 2006, the court extended the TRO for an additional ten days, and on February 8, 2006, the bankruptcy court held a hearing on the preliminary injunction. At the hearing, the Defendants argued that the bond should be increased due to the increase in the duration of the injunction. The Casino, on the other hand, argued that the bond should actually be decreased because the Defendants would receive *more* income through the $1.50 validations than they would without them,

---

[4] Although a plaintiff has never prevailed on a *prima facie* tort theory in Missouri, the elements of the action are: (1) an intentional lawful act by the defendant; (2) intent to cause injury to the plaintiff; (3) injury to the plaintiff; (4) an absence of any justification or an insufficient justification for the defendant's act. *See Cridlebaugh v. Putnam County State Bank of Milan*, 192 S.W.3d 540, 545 (Mo. Ct. App. 2006).

[5] Apparently, the bankruptcy court determined the amount after an *ex parte* meeting in chambers. The parties have made several suggestions as to how the bankruptcy court calculated the amount of the bond for the initial TRO, but our review is limited to the actual record on appeal.

because almost no one would park on the lot for $10. In support of this claim, the Debtors pointed to evidence showing that there was a significant (nearly 4,000%) decrease in the number of cars parking on the Cherrick Lot during the period of time when the Casino wasn't validating parking receipts. The number of cars parking on the lot returned to normal levels almost immediately after the injunction was put into effect. The Court granted the preliminary injunction and set the trial on the underlying case for April 5, 2006.

On March 13, the court canceled the April trial date and set October 2 as a cut-off date for discovery, with an anticipated trial date sometime in 2007. On May 23, the Defendants filed a motion requesting that the preliminary injunction be modified by ordering the Plaintiffs to immediately post a bond in the additional amount of $417,000, and $78,500 per week for every week the injunction remained in place or, alternatively, for a blanket bond of $4.5 million. The bankruptcy court denied that motion and ordered the Casino to post the previously approved $525,000 bond within five days.[6]

In denying the request that the bond be increased, the bankruptcy court noted that the bond amount must be reasonable and bear a relationship to the defendant's probable damages in the event it is later determined that the injunction should not have been entered, citing *Hill v. Xyquad, Inc.*[7] The Plaintiffs had argued that at $10 per car fewer cars would park at the Cherrick Lot and that the Defendants were actually making *more* money with the injunction in place than they would without it. The court accepted that argument, stating that the Defendants' estimation of their losses was flawed in that the Defendants had failed to produce any evidence that 40,000 cars (or any significant number) would park on the Cherrick Lot if it cost $10

---

[6] The Casino had yet to post the bond ordered by the court at the TRO hearing.

[7] 939 F.2d 627, 632 (8th Cir. 1991).

to park there. In sum, the bankruptcy court concluded that there was no reason to increase the bond amount because there was no evidence that Defendants' potential damages would exceed the amount of the bond.

We granted leave to hear this interlocutory appeal on July 28, 2006.

## III.  DISCUSSION

The Defendants do not dispute that the bankruptcy court used the proper legal standard to determine the appropriate amount of the bond, *i.e.*, that the bond must bear a rational relationship to the defendant's probable damages in the event it is later determined that the injunction should not have been entered.[8] Rather, the Defendants contend that the bankruptcy court erred in its estimation of the Defendants' damages. That is a factual finding which we review for clear error – and we find that none was committed.

The party requesting a bond bears the burden of establishing a rational basis for the amount of the proposed bond.[9] Similarly, a party seeking an increase in the amount of a bond bears the burden of justifying the increase.[10] The Defendants, however, failed to offer any evidence justifying an increase in the bond. They alleged that they would lose $78,500 every week the injunction was in place, calculated by multiplying the difference between the validation rate and the $10 rate they intended to charge by the average 40,000 cars parking at the Cherrick Lot every month, but they failed to support that allegation with any evidence showing that anyone would actually park at the Cherrick Lot for $10 or that the Casino would validate receipts at

---

[8] *Xyquad, Inc.*, 939 F.2d at 632.

[9] *International Equity Investments, Inc. v. Opportunity Equity Partners, Ltd.*, 441 F.Supp.2d 552, 565-66 (S.D. N.Y. 2006) (citations omitted).

[10] *Commonwealth of Puerto Rico v. Price Commission*, 342 F.Supp. 1308, 1310-11 (D. P.R. 1972).

that price. To the contrary, the only evidence showing a relationship between price and parking rates showed that parking rates declined – sharply – when the Casino wasn't validating parking receipts and that the Casino only paid the higher validation rate when the bankruptcy court ordered it to do so. A court is not required to order a bond to protect a party from economic damages that are speculative.[11] And the damages the Defendants claim will occur are purely speculative. Thus, the bankruptcy court's decision not to increase the amount of the bond is supported by the evidence and will not be set aside as clearly erroneous.

In the absence of factual evidence supporting their position, the Defendants rely heavily on *Rathmann Group v. Tannenbaum*,[12] a case with arguably analogous facts in which the Eighth Circuit Court of Appeals reversed a district court's decision to leave the amount of a bond unchanged even though the associated injunction was extended from 10 days to a year. But *Rathmann* does not compel a reversal here.

First, *Rathmann* does not establish a *per se* rule that the bond set as security for a 10-day TRO must be increased if the duration of the injunction is extended and that the failure to do so is an abuse of discretion. In *Rathmann*, the Eighth Circuit reversed the district court because it "neglected to consider the question of requiring a bond in addition to the [bond] already posted."[13] In contrast, in this case the bankruptcy court squarely considered whether an additional bond was necessary and concluded that the evidence did not support or necessitate an increase in the bond.

Second, *Rathmann* is inapposite to this case for the simple reason that the record in *Rathmann* contained evidence that the party requesting an increase in the

---

[11] *International Equity Investments, Inc.*, 441 F.Supp.2d at 565-66.

[12]  889 F.2d 787.

[13]  *Id.* at 789.

bond was actually suffering losses as a result of the injunction. We have no such evidence before us here. To the contrary, the evidence indicates that the Defendants will receive more money with the injunction than they would receive without the injunction.

Third, *Rathmann* is of limited value here because the record before us is devoid of any explanation of how the bankruptcy court determined the amount of the bond for the TRO. If the bankruptcy court had made specific findings at that time regarding the potential damages to the Defendants, their argument that the bankruptcy court's decision not to increase the bond was inconsistent with an earlier ruling might carry more weight, but that is not the case.[14] In the absence of such specific findings in the order granting the TRO or the preliminary injunction order, the bankruptcy court essentially operated on a clean slate, and on that clean slate it specifically found that the Defendants did not establish a reasonable relationship between the bond sought and their potential damages.

## IV. CONCLUSION

For the reasons stated above, we affirm the order of the bankruptcy court denying the Defendants' motion to modify the injunction.

---

[14] Even if the bankruptcy court had made specific findings regarding the potential damage to the Defendants, the Defendants' motion itself demonstrates that a bankruptcy court is always free to revisit the adequacy of a bond.